EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Herbert W. Brown III<br>      Peticionario<br><br>              v.<br><br>Junta de Directores<br>Condominio Playa Grande<br>      Recurrido | Certiorari<br><br>2001 TSPR 80 |

Número del Caso: CC-2000-265

Fecha: 6/junio/2001

Tribunal de Circuito de Apelaciones:

Circuito Regional I

Juez Ponente:

Hon. Angel González Román

Abogada de Parte Peticionaria:

Lcda.  Diana Lynn Pagán Rosado

Abogado de la Parte Recurrida:

Lcdo. Ricardo A. Ramírez Lugo

Materia: Propiedad Horizontal

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Herbert W. Brown III

    Peticionario

        vs.                       CC-2000-265         CERTIORARI

Junta de Directores
Condominio Playa Grande

    Recurrido

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 6 de junio de 2001

El Condominio Playa Grande, localizado en la Calle Taft Núm. 1, Santurce, es un edificio que fue sometido al Régimen de Propiedad Horizontal, mediante Escritura Número 70 de 4 de noviembre de 1966, otorgada ante el notario Francisco Vizcarrondo Norell. La escritura matriz del condominio establece un área de doce (12) estacionamientos de visitantes que se designan como <u>áreas o facilidades comunales</u> del proyecto.

El 18 de febrero de 1987 se celebró una Asamblea Extraordinaria para atemperar la utilización irrestricta de dichos estacionamientos por un pequeño grupo de condóminos, además de la utilización excesiva y permanente de dichos

elementos comunes por personas no autorizadas. Se acordó <u>por voto</u> <u>mayoritario</u> de los titulares una Resolución que contenía el siguiente esquema:

> "[P]ara que todos los [condómines] interesados tengan la oportunidad de utilizar una de dichas áreas de estacionamientos, se celebrará un sorteo cada seis (6) meses calendarios, y a los que resulten agraciados, la Junta de Directores les asignará a cada uno un espacio para su exclusivo uso personal, o uso de sus visitantes, por un término de seis (6) meses calendarios consecutivos. [Q]uienes resulten agraciados en un sorteo no podrán participar, directa o a través de otros, en sorteos siguientes hasta tanto todos los titulares interesados hayan tenido su oportunidad de usar uno de dichos espacios por seis (6) meses calendarios consecutivos. [P]or el uso exclusivo de uno de dichos espacios, el usuario satisfará al Condominio una cuota especial de mantenimiento ascendente a cincuenta dólares ($50.00) por cada mes, en adición a la cuota mensual ordinaria de mantenimiento." [...][1]

Casi once (11) años luego de la vigencia de este acuerdo, el Lcdo. Herbert Brown presentó una querella ante el Departamento de Asuntos del Consumidor (D.A.C.O.), el 18 de diciembre de 1998, impugnando el mismo. Adujo el referido condómino que tal acuerdo tiene el efecto de <u>alterar</u> <u>la naturaleza del elemento común general de los estacionamientos</u> <u>designados para visitantes</u>, razón por la cual se requería la aprobación por la <u>unanimidad</u> de los titulares del inmueble, ello conforme con las disposiciones del <u>Artículo 12</u> de la Ley de Propiedad Horizontal, 31 L.P.R.A. sec. 1291j. Solicitó el Lcdo. Brown del D.A.C.O. que declarase ilegal y nula la Resolución del 18 de febrero de 1987 y que ordenase el cese y desiste de dicha práctica.

El 22 de diciembre de 1998, la Junta fue debidamente notificada de la querella radicada, D.A.C.O. señaló la vista adjudicativa para el día 30 de julio de 1999. Llegado el día de la vista, la Junta no compareció; anotándosele la rebeldía a la Junta por su incomparecencia.

El 13 de septiembre de 1999, la Junta solicitó la desestimación de la querella, alegando: (1) que el esquema de sorteo de los estacionamientos en controversia respondía al "bien común" de los condóminos; (2) que el Lcdo. Brown se benefició del esquema y consintió al mismo por varios años;

---

[1] Véase Sentencia del Tribunal del Circuito de Apelaciones de fecha de 11 de febrero de 2000, Apéndice, págs. 194-205.

(4) que la Junta no violó la Ley de Propiedad Horizontal; y, (5) que la acción de impugnación en D.A.C.O. estaba prescrita.

El 24 de septiembre de 1999, D.A.C.O. emitió una resolución en la cual determinó que el esquema de sorteo de estacionamientos de visitantes, acordado en la Asamblea del 18 de febrero de 1987, era nulo por ser el mismo contrario a la Ley de Propiedad Horizontal, ante. Sostuvo la referida Agencia que dicho esquema no era una obra necesaria para el uso eficaz de los elementos comunes y para la conservación del inmueble, lo cual puede aprobarse por mayoría, sino que era una obra que afectaba los elementos comunes, razón por la cual requería el consentimiento unánime del Consejo de Titulares, conforme las disposiciones del Artículo 16 de la Ley de Propiedad Horizontal, 31 L.P.R.A. sec. 1291n. Sostuvo, además, el D.A.C.O. que el Artículo 12 de la antes citada ley requiere que todo acuerdo que afecte un elemento común general y lo convierta en un elemento común limitado tiene que aprobarse por la unanimidad de los titulares. En vista a ello, D.A.C.O. declaró nulo el acuerdo y ordenó a la Junta que devolviera los estacionamientos para el uso de los visitantes.

Inconforme, la Junta presentó un escrito de revisión ante el Tribunal de Circuito de Apelaciones el 22 de noviembre de 1999. Contando con los escritos en oposición del Lcdo. Brown y de D.A.C.O., el Tribunal Apelativo dictó sentencia el 11 de febrero de 2000. Mediante dicha sentencia, el tribunal apelativo intermedio resolvió que D.A.C.O. erró al concluir que la resolución recurrida del esquema de sorteo era nula porque se aprobó por mayoría en lugar de por unanimidad. El Tribunal de Circuito de Apelaciones sostuvo que, conforme al citado Artículo 16 de la Ley de Propiedad Horizontal, ante, la creación de un esquema de sorteo rotativo de los espacios de estacionamientos no constituyó una "obra", sino que fue un acto de administración del Consejo de Titulares; concluyó que dicho esquema no varió la naturaleza de los estacionamientos, como tampoco dispuso de los mismos a favor de una minoría de apartamentos; en otras palabras, resolvió el foro judicial que el esquema de sorteo no transformó los estacionamientos de visitantes de "elementos comunes generales" a "elementos comunes limitados"; determinó que el esquema impugnado no excluyó a ningún

apartamento del uso y disfrute de los estacionamientos, sino que sólo fijó un orden aleatorio para el disfrute temporero de todos los titulares; el tribunal apelativo, por último, determinó que, conforme al Artículo 38 de la Ley de Propiedad Horizontal, 31 L.P.R.A. sec, 1293b(2)(h)[2], la actuación del Consejo de Titulares, en su función de tomar decisiones de interés general para la comunidad y de tomar las medidas necesarias y convenientes para el mejor servicio común, era una actuación a ser aprobada por voto mayoritario, y no por unanimidad. Por ende, concibió que el esquema aprobado era un acto de administración del Consejo de Titulares, por lo que no requería voto unánime de los condóminos.

Mediante recurso de *certiorari*, radicado el 24 de marzo de 2000, el querellante-peticionario, Lcdo. Herbert Brown, acudió ante este Tribunal en solicitud de revisión de la sentencia emitida por el Tribunal de Circuito de Apelaciones. El peticionario sostiene, como único señalamiento de error, que incidió:

> "... el Honorable Tribunal de Circuito de Apelaciones al emitir sentencia revocando la resolución de D.A.C.O. ya que dicha sentencia es contraria a las disposiciones de la Ley de Propiedad Horizontal de Puerto Rico".

**Expedimos el recurso**. Estando en posición de resolver el mismo, procedemos a así hacerlo.

I

Nos toca resolver si el esquema de sorteo de estacionamientos aquí impugnado es un acto de administración del Consejo de Titulares o si, por el contrario, es un acto que transforma el uso y destino de un elemento común general a uno limitado. Es decir, nos atañe identificar si el acto mediante el cual la Junta destinó los estacionamientos de visitantes, al uso de algunos titulares mediante sorteo, es propiamente un acto de administración o si alteró el título constitutivo por modificar el uso y destino de estos elementos comunes. Veamos.

---

[2] Dicho artículo dispone, en lo pertinente, que le corresponde al Consejo de Titulares: "Intervenir y tomar decisiones sobre aquellos asuntos de interés general para la comunidad así como

Sabido es que en nuestra jurisdicción existe una clara política pública que respalda la utilización del Régimen de Propiedad Horizontal para terrenos y construcciones de multipisos. Soto Vazquez v. Vazquez Torres, 138 D.P.R. 282 (1995). Hemos sostenido que el valor social y económico promovido por la Ley de Propiedad Horizontal es de tal transcendencia que su interpretación debe ser "constructiva e imaginativa". Castle Enterprises, Inc. v. Registrador, 87 D.P.R. 775 (1963); reiterado en Cond. Prof. S.J.H. Centre v. P.R.F., Inc., 133 D.P.R. 488 (1993) y Soto Vazquez v. Vazquez Torres, ante. Por lo tanto, la interpretación debe ceñirse a la definición misma del Régimen; es decir, la "coexistencia de diversos pisos de dominio exclusivo con el condominio forzoso e inescapable de elementos comunes". Consejo de Tit. Cond. McKinley Court v. Rullán, 126 D.P.R. 387, 393 (1990), citando a Arce v. Carribbean Home Const. Corp., 126 D.P.R. 387, 236-237 (1978).

Para someter una propiedad al referido régimen, el titular debe hacer constar expresamente su voluntad de así hacerlo en escritura pública e inscribirla en el Registro de la Propiedad, conforme con el Artículo 2 de la Ley de Propiedad Horizontal, 31 L.P.R.A. sec. 1291. García Larrinua v. Lichtig, 118 D.P.R. 120 (1986). Por ende, la escritura que constituye el Régimen "es un estatuto privado -al cual se adhieren los titulares cuando compran sus respectivos apartamentos- que gobierna a los condóminos o titulares y a cuyas disposiciones debemos acudir para dirimir cualquier conflicto, a menos que tales disposiciones violen la ley, la moral o el orden público". 31 L.P.R.A. sec. 3372; Consejo de Titulares v. Vargas, 101 D.P.R. 579, 582 (1973)"; Consejo Tit. McKinley Court v. Rullán, 126 D.P.R. 387, 394 (1990). Con esto en mente, analizamos la controversia ante nos.

II

---

tomar aquellas medidas necesarias y convenientes para el mejor servicio común".

El Artículo 11 de la Ley de Propiedad Horizontal, Ley Núm. 104 de 25 de junio de 1958, 31 L.P.R.A. 1291i, previo a las enmiendas introducidas en el 1976[3], establecía los elementos que obligatoriamente son comunes:

> "Sec. 1291i. Elementos generales del inmueble
> Se consideran elementos comunes generales del inmueble:
> (a)    El terreno en que se asiente el edificio.
> (b)    Los cimientos, paredes maestras, techos, galerías, vestíbulos, escaleras, y vías de entrada y salida o de comunicación.
> (c)    Los sótanos, azoteas, patios y jardines, salvo disposición o estipulación en contrario.
> (d)    Los locales destinados a alojamiento de porteros o encargados del edificio, salvo disposición o estipulación en contrario.
> (e)    Los locales o instalaciones de servicios centrales, como electricidad, luz, gas, agua fría y caliente, refrigeración, cisternas, tanques y bombas de agua, y demás similares.
> (f)    Los ascensores, incineradores de residuos y, en general, todos los artefactos o instalaciones existentes para beneficio común.
> (g)    Todo lo demás que fuere racionalmente de uso común del edificio o necesario para su existencia, conservación y seguridad."

Los elementos comunes enumerados en el Artículo 11, ante, tienen el carácter de "numerus apertus"; esto es, se permite pactar en la escritura matriz elementos comunes generales no incluidos en dicha enumeración. Arce v. Caribbean Home Const. Corp., ante. En esencia, el antes citado artículo enumera elementos comunes generales necesarios y elementos comunes voluntarios. La diferencia entre estos elementos estriba en que los primeros no admiten disposiciones en contrario, mientras que los segundos lo permiten. Arce v. Caribbean Home Const. Corp., ante. Según este artículo, existen elementos comunes generales que son necesarios para la existencia, seguridad y conservación del edificio y destinados al uso y disfrute de todos los apartamentos. Arce v. Caribbean Home Const. Corp., ante, 237. Debido a ello, no son susceptibles de ser propiedad exclusiva de unos titulares, excluyendo a los demás, pues resultaría incompatible con el buen funcionamiento del condominio. Pellón

---

[3] Tomamos en consideración el artículo vigente a la fecha en que Playa Grande se sometió al régimen de propiedad horizontal. No obstante, cabe señalar que la Ley Núm. 157 de 4 de junio de 1976 enmendó dicho artículo para incluir el vuelo y las áreas destinadas a actividades recreativas en el inciso (a), al igual que sustituyó el inciso (g) para incluir

v. O'Clare, 98 D.P.R. 692, 695 (1970). Los elementos comunes voluntarios admiten pacto en contrario; y, una vez constituido el régimen, dichos elementos se pueden alterar mediante el consentimiento de todos los propietarios de los apartamentos. Arce v. Caribbean Home Const. Corp., ante.

En Pellón v. O'Clare, ante, caso resuelto conforme con el antes citado artículo 11, resolvimos que unas áreas de garajes designadas como "privadas" en la escritura matriz no son elementos comunes sino que mantienen el carácter conferido en el título constitutivo. Posteriormente, hemos precisado que los lugares de estacionamiento en un condominio pueden ser tanto elementos comunes generales, ya sean necesarios o voluntarios, como elementos comunes limitados o elementos privados. Arce v. Caribbean Home Const. Corp., ante.

A estos efectos, el Profesor Michel J. Godreau sostiene que: "el espacio dedicado a *área de estacionamiento* es un elemento común voluntario, pudiendo el titular original destinarlo a uno particular. De no destinarse un elemento común voluntario a un particular, se tratará el mismo como elemento común general, no susceptible de indivisión al igual que los restantes elementos comunes, aunque sí susceptible de transformarse en privativo mediante el consentimiento unánime de los titulares". El Condominio: el Régimen de la Propiedad Horizontal en Puerto Rico, Puerto Rico, Ed. Dictum, 1992, 84-85. No obstante, desde Pellón, ante, señalamos que la naturaleza privada o común de un local de estacionamiento depende esencialmente de lo que se estipule en la escritura matriz.

El caso ante nos plantea una situación similar al caso de Pellón. Aunque al momento de constituirse el régimen del Condominio Playa Grande, la Ley de Propiedad Horizontal no contemplaba específicamente las áreas de estacionamiento como elementos comunes, la escritura matriz del condominio estableció dichas áreas como elementos comunes generales, destinadas al uso de los visitantes de los condóminos.

---

específicamente en los elementos comunes, salvo disposición en contrario, las áreas de estacionamiento.

Las disposiciones y estipulaciones de la escritura matriz <u>rigen y vinculan</u> los actos de todos los titulares o condóminos presentes y futuros, como a terceros. <u>Soto Vázquez</u> v. <u>Vázquez Torres</u>, ante; <u>Consejo de Titulares</u> v. <u>Vargas</u>, ante. Los pactos y acuerdos ahí comprendidos "forman un estado de derecho a ser aceptado por los sucesivos titulares a medida que éstos adquirieran su condominio". <u>Arce</u> v. <u>Caribbean Home Const. Corp.</u>, ante, 245. Sus cláusulas <u>obligan</u> a todos los titulares, salvo que violen alguna de las disposiciones del Artículo 1207 del Código Civil, 31 L.P.R.A. sec. 3372, referentes a las leyes, a la moral, o al orden público. Id.

La escritura matriz constituye "una de las fuentes que rigen la conducta del Consejo de Titulares y cuyas disposiciones viene obligado a obedecer". <u>Consejo de Titulares del Condominio Galerías Ponceñas</u> v. <u>Ponceñas Incorporado</u>, res. el 16 de abril de 1998, 98 TSPR 43. Es a dicha escritura matriz que debemos acudir para dirimir el conflicto en el caso ante nos.

### III

El artículo octavo de la escritura matriz mediante el cual el Condominio Playa Grande se sometió al régimen de propiedad horizontal, en lo pertinente, dispone:

"**OCTAVO:** (A) Que las <u>áreas y facilidades comunales</u> del proyecto serán las siguientes:

....

16) <u>Doce espacios de estacionamiento para visitantes localizados en el patio Oeste del edificio adyacentes a la entrada principal del mismo</u>." (Énfasis suplido).[4]

---

[4] Aunque la escritura matriz se refiere a doce (12) estacionamientos para visitantes, el peticionario aduce que la Resolución menciona once (11) porque se utilizó uno de los espacios para construir una rampa para impedidos.

De una lectura del título constitutivo del Condominio Playa Grande es evidente que los espacios o áreas de estacionamiento en disputa son elementos comunes generales voluntarios. Estos elementos fueron designados, específicamente, elementos comunes para el disfrute de los visitantes de todos los titulares del condominio. La estipulación, comprendida en la escritura matriz del régimen, constituye un beneficio común para todos los titulares, al proveerles estacionamientos a sus visitantes.

La propia Ley de Propiedad Horizontal, en el tercer párrafo del Artículo 2, 31 L.P.R.A. sec. 1291, dispone:[5]

> "La escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble, y una vez fijado dicho uso sólo podrá ser variado mediante el consentimiento unánime de los titulares."(Énfasis suplido).

El claro mandato de ley establece que, para alterar el uso o beneficio comprendido en dichas áreas, es necesario el consentimiento unánime de los titulares.[6] La expresión manifiesta e inequívoca del artículo octavo de la escritura matriz del Condominio Playa Grande, esto es, del título constitutivo del régimen, establece el uso del área de estacionamiento aquí impugnado como un elemento común. Por lo tanto, conforme a la Ley de Propiedad Horizontal, y el lenguaje claro y preciso

---

[5] Cabe señalar que la Ley Núm. 153 de 11 de agosto de 1995 sustituyó "el consentimiento unánime de los titulares" del tercer párrafo del Artículo 1 de la Ley de Propiedad Horizontal con "el consentimiento del setenta y cinco (75) por ciento". Mediante la Ley Núm. 43 del 21 de mayo de 1996, la enmienda de dicho artículo fue derogada *nunc pro tunc*.

[6] Igualmente sostiene M. Batlle Vázquez: "La necesidad del acuerdo unánime de los propietarios se establece cuando la alteración implique la modificación del régimen fundamental señalado en los estatutos o en el título constitutivo de la propiedad (L.P.H., art. 16, 1.ª), o se refiere a la estructura o fabrica del edificio (L.P.H. 11)". La Propiedad de casa por pisos, Octava ed., España, Ed. Marfil, 1980, 125. Véase, además, A. Ventura Traveset y González, Derecho de Propiedad Horizontal, Tercera ed., España, Ed. Bosch, 1976, 354-356.

del título constitutivo, era necesario obtener el <u>consentimiento unánime de los titulares.</u>

El esquema aprobado por la mayoría de los titulares tuvo el efecto de <u>alterar el uso y destino de las áreas de estacionamiento de visitantes</u> porque las convirtió en áreas de estacionamiento para el <u>uso exclusivo de los titulares</u> de los condóminos que ganaran el sorteo. El hecho de que el esquema es rotativo, y los titulares con derecho a los espacios cambian cada seis meses hasta que todos los titulares hayan tenido la oportunidad de utilizar uno de los referidos espacios, <u>no</u> cambia la realidad de que el mismo altera el uso y destino de los referidos espacios. Antes del esquema aprobado, los espacios estaban designados <u>para uso de los visitantes de todos los titulares</u>. Luego de la aprobación del esquema, dichos estacionamientos corresponden exclusivamente a los ganadores del sorteo por el término de seis meses y el pago de una cuota de cincuenta dólares ($50.00) mensuales. Claramente, se desprende que el esquema aquí impugnado <u>cambió</u> el uso general de los espacios designados a visitantes para convertirlos a espacios con uso limitado a los condóminos ganadores del sorteo.

<u>La Ley de Propiedad Horizontal, no hay duda, permite que ello se haga, pero, la misma requiere que el cambio de elementos comunes generales a elementos comunes limitados se lleve a cabo mediante el acuerdo de todos los titulares</u>. A esos efectos, el Artículo 12 de la referida Ley específicamente establece que:

> "También serán considerados elementos comunes, pero con carácter limitado, <u>siempre que así se acuerde expresamente por la totalidad de los titulares del inmueble</u>, aquellos que se destinan al servicio de cierto número de apartamentos con exclusión de los demás, tales como pasillos, escaleras y ascensores especiales, servicios sanitarios comunes a los apartamentos de un mismo piso y otros análogos." (Énfasis suplido).[7]

---

[7] Mediante la Ley Núm. 153 de 11 de agosto de 1995 se sustituyó el requisito de la "totalidad de los titulares" por el de "setenta y cinco (75) por ciento".

<u>Ello no obstante</u>, mediante la Ley Núm. 43 de 21 de mayo de 1996, el legislador enmendó, nuevamente, la Ley de Propiedad Horizontal para, nuevamente, requerir el consentimiento de la "totalidad de los titulares"; <u>esto es, se volvió al "estado de derecho"</u> previo a la enmienda del año 1995.

En <u>Arce</u> v. <u>Caribbean Home Const. Corp.</u>, ante, nos enfrentamos a un acuerdo adoptado por la <u>mayoría</u> de los condóminos, que cambiaba el uso de dos elevadores, elementos comunes generales, para reservarlos exclusivamente para los pisos propiedad de Caribbean Towers, Inc., convirtiendo así un elemento común general a uno de uso limitado. Resolvimos que este cambio, por variar el uso y destino del elemento común, dispuesto así por mandato de ley, <u>requería el consentimiento expreso de la totalidad de los titulares del edificio</u>, conforme con el citado Artículo 12; <u>ello por convertir el uso de un elemento común general en un elemento común limitado</u>.

Los recurridos argumentan que el acuerdo tiene el efecto de promover el uso eficaz de un elemento común general, para el beneficio de todos los titulares. Sobre este particular, en <u>Arce</u>, ante, expresamos:

> "Toda vez que el adquirente de un apartamento sometido al régimen de propiedad horizontal adquiere también un derecho de copropiedad sobre todos los elementos comunes, i.e. ascensores, <u>es indispensable su consentimiento para disponer de éstos. No podían los demandados, bajo pretexto de asegurar el funcionamiento más eficaz de un elemento común variar el destino de éste, convirtiéndolo para todo fin práctico en un elemento común limitado</u> de Caribbean Towers, Inc., suprimiéndole así el carácter común general." (Énfasis suplido). <u>Arce</u> v. <u>Caribbean Home Const. Corp.</u>, ante, 249.

Por ende, <u>no</u> podemos sostener que dicho acuerdo es un mero acto de administración ya que el mismo varía tanto lo dispuesto expresamente en el título constitutivo del condominio, como el uso y destino de un elemento común general a uno limitado. La escritura matriz del Condominio Playa Grande estipuló que estas áreas de estacionamiento eran para el uso de los visitantes de los condóminos. Luego de la resolución del 18 de febrero de 1987, estos estacionamientos se convirtieron en estacionamientos utilizados por los titulares ganadores del sorteo, que alquilaban estos espacios para su uso particular.

El alegado acto de administración por el Consejo de Titulares <u>no</u> puede contravenir la Ley de Propiedad Horizontal y el título constitutivo del régimen. Hemos establecido que en la jerarquía de las fuentes de propiedad horizontal, "la Ley de Propiedad Horizontal posee primacía, por

lo que cualquier disposición claramente contraria a sus disposiciones que contenga la Escritura Matriz o el Reglamento sería nula". Consejo de Titulares Galerías Ponceñas v. Ponceñas Incorporado, ante. Forzoso nos resulta concluir que la Resolución aprobada por la mayoría de los titulares, que altera el uso de un elemento común general, es nula por ser contraria a la Ley de Propiedad Horizontal y a la Escritura Matriz.


                                    IV

        La Junta recurrida argumenta, por último, que debe mantenerse el esquema aprobado en vista del hecho que el mismo se mantuvo en vigor por muchos años sin ser impugnado, creándose así una "apariencia" de validez.

        Una actuación nula es inexistente, por lo que no genera consecuencias jurídicas.  Dicho de otro modo, "...lo nulo nunca tuvo eficacia alguna, nunca nació en derecho, nunca existió". Montañez Rivera v. Policía de P.R., res. el 3 de mayo de 2000, 2000 TSPR 68. Por lo tanto, la resolución de la asamblea extraordinaria de titulares del Condominio Playa Grande, celebrada el 18 de febrero de 1987, es nula por ser contraria a la ley. Es por tanto ineficaz y contrario a derecho el esquema de sorteo de estacionamientos aprobado por la mayoría de los titulares; el mismo requería el consentimiento unánime de los titulares.

        "Sólo cuando el acto nulo haya provocado una "apariencia" de realidad o validez, es necesario o conveniente destruir esa "apariencia", si constituye obstáculo para el ejercicio de un derecho y puede impugnarlo _cualquier persona que tenga interés en ello_ sin que sea confirmable, ni prescriptible; debiendo reponerse las cosas al estado que tenían al tiempo de su realización". (Enfasis suplido.) A. Ventura-Traveset y González, ante, 365-366.

        Por los fundamentos que anteceden, procede decretar la revocación de la sentencia del Tribunal de Circuito de Apelaciones que declaró válido el esquema de sorteo aquí en controversia, procediendo la reinstalación de la decisión emitida en el caso por el Departamento de Asuntos del Consumidor.

        Se dictará Sentencia de Conformidad.

**FRANCISCO REBOLLO LÓPEZ**
**Juez Asociado**

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Herbert W. Brown III

     Peticionario

        vs.                           CC-2000-265        CERTIORARI

Junta de Directores
Condominio Playa Grande

     Recurrido


SENTENCIA

San Juan, Puerto Rico, a 6 de junio de 2001


       Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida por el Tribunal de Circuito de Apelaciones en el presente caso. En consecuencia, procede la reinstalación de la decisión emitida en el mismo por el Departamento de Asuntos del Consumidor.

       Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton emitió Opinión Concurrente. Los Jueces Asociados señora Naveira de Rodón y señor Corrada del Río inhibidos.


                Isabel Llompart Zeno
            Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Herbert W. Brown III

    Peticionario

        v.                                CC-2000-265          Certiorari

Junta de Directores
Condominio Playa Grande.

    Recurrido

Opinión Concurrente emitida por el Juez Asociado señor Hernández Denton

San Juan, Puerto Rico, a 6 de junio de 2001.

Aunque estamos de acuerdo con el resultado de la Opinión del Tribunal, en tanto declara la nulidad del esquema de sorteo de estacionamientos de visitantes en el Condominio Playa Grande, discrepamos del argumento principal subyacente. Concurrimos en Opinión separada por entender que, aunque el acuerdo impugnado es nulo, pues altera el uso al que está destinada el área de estacionamientos de visitantes —acción que requiere el consentimiento unánime de los titulares—, no transforma por ello la naturaleza de este elemento de uno común general a uno común limitado.

I

La escritura matriz del Condominio Playa Grande define, entre los elementos comunes del inmueble, un conjunto de doce (12) estacionamientos cuyo uso queda expresamente reservado a los automóviles de los visitantes al edificio. No obstante lo allí consignado, para 1987 varios condóminos empleaban regularmente dichos espacios para aparcar sus vehículos particulares.

Como respuesta a esta práctica, el Consejo de Titulares acordó por voto mayoritario, aunque no unánime, conformar el uso efectivo de los espacios de estacionamiento a un sorteo bianual entre los titulares, que conferiría a aquellos que resultaren agraciados el uso exclusivo del estacionamiento durante el periodo limitado de seis meses. Además, como salvaguarda contra la presunta inequidad del azar, los titulares beneficiados en un sorteo no podrían participar en otro posterior hasta que todos los condóminos interesados hubieren tenido oportunidad de disfrutar de un espacio de estacionamiento durante un periodo de seis meses. Por el uso de la plaza se requeriría al condómino el pago de una cuota especial de mantenimiento de cincuenta dólares ($50.00) mensuales mientras durase el periodo señalado.

Cabe resaltar, como esencial para el entendimiento de la norma que favoreceríamos hoy, que a los titulares agraciados en el sorteo se les concedía el uso del estacionamiento para cualquier vehículo, fuere propio o de sus visitantes. No se imponía límite o restricción alguna que reservara el uso de dichas plazas a los visitantes al apartamento concernido. Consideramos que fue éste el elemento que vició la decisión del Consejo de Titulares, no la mera asignación de turnos para el uso de los estacionamientos.

II

La Ley de Propiedad Horizontal (en adelante "la Ley") clasifica los elementos de un inmueble sometido a dicho régimen en comunes generales, comunes limitados y privativos. 31 L.P.R.A. sec. 1291i a 1291*l*. Además del derecho propietario que cada titular tiene en cuanto a su apartamento, la Ley le otorga "una participación con los demás titulares en los elementos comunes del inmueble". Art. 8, 31 L.P.R.A. sec.1291f. El objeto de dicho porcentaje, explica el Prof. Vázquez Bote, remite al <u>concepto de uso y disfrute</u> de dichos elementos. E. Vázquez Bote, VIII <u>Tratado Teórico, Práctico y Crítico de Derecho Privado Puertorriqueño</u> (Derechos Reales II), sec. 4.9, pág. 168 (1993). Es del análisis de dicho concepto que hemos de aclarar la norma que rige la controversia actual.

A

El concepto de uso de los elementos comunes, explica el Prof. Vázquez Bote, "no es unívoco, sino variado". Comprende, en su acepción primera, "[e]l <u>uso del área inmobiliaria</u>, es decir, el destino que se da al inmueble sometido al régimen de propiedad horizontal, que sólo puede modificarse con el consentimiento unánime de todos los titulares". Vázquez

Bote, supra, pág. 169.  A éste concepto se refiere el Art. 22 de la Ley, 31 L.P.R.A. sec. 1292, cuando exige que se indique en la escritura matriz el destino que ha de dársele al inmueble y a cada uno de sus apartamentos y que se describan sus elementos comunes generales y limitados.  A la misma acepción también se refiere el Art. 2 de la Ley, 31 L.P.R.A. sec. 1291, cuando dice que "[l]a escritura que establezca el régimen de Propiedad Horizontal expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble, y una vez fijado dicho uso sólo podrá ser variado mediante el consentimiento unánime de los titulares."  Estas disposiciones a la vez limitan el uso de un inmueble al fin o fines expresados en la escritura y conceden a cada titular el derecho a servirse de los elementos comunes y privativos de acuerdo a ese propósito.

La Ley también es clara en que el cambio o alteración de cualquiera de los elementos comunes —sea en cuanto a su estructura física, naturaleza, titularidad o destino— requiere el consentimiento unánime de los condóminos.  Un vistazo a los cambios o alteraciones enumeradas en la Ley revela que los acuerdos que requieren unanimidad para su aprobación son aquellos que afectan el contorno registral o la estructura física del inmueble, esta última a su vez remitida al efecto que ha de provocar en el Registro de la Propiedad.  De ordinario, se exige unanimidad para hacer alteraciones al uso que ha de darse al inmueble, realizar nuevas construcciones en el mismo, adquirir, agregar y segregar elementos comunes, hipotecar alguno de éstos, o cambiar su naturaleza titular de común general a limitada o privativa, o viceversa.  Dicha norma también es extensiva a cualquier otra transacción u operación que tenga efecto real o requiera anotación correspondiente en el Registro de la Propiedad.  Se abona así a lo observado por Batlle Vázquez:

> "La necesidad del acuerdo unánime de los propietarios se establece cuando la alteración implique modificación del régimen fundamental señalado en los estatutos o en el título constitutivo de la propiedad […], o se refiera a la estructura o fábrica del edificio." M. Batlle Vázquez, La Propiedad de Casas por Pisos, pág. 125 (8ª ed. 1980).

Cabe concluir que aquellos acuerdos que no impliquen modificaciones al carácter material o registral del condominio, salvo clara expresión legislativa, no requerirán acuerdo unánime por no afectar, en este sentido, el uso del área inmobiliaria.

B

Distinto al concepto de uso qua destino, Vázquez Bote reconoce en la Ley una segunda acepción del vocablo, viz. "[e]l uso normal de que es susceptible el inmueble, por parte de todos y cada uno de los partícipes en la horizontalidad, al servirse de los elementos comunes del inmueble según el inherente objetivo". Vázquez Bote, supra. Se representa así el ejercicio por cada titular del condominio del derecho de uso conferido por los Arts. 8 y 14 de la Ley, 31 L.P.R.A. secs. 1291f y 1291l.

La necesidad de concertar el derecho de uso de todos los titulares de un inmueble requiere a menudo que el Consejo de Titulares intervenga, acorde con el Art. 16, 31 L.P.R.A. sec. 1291n ("Las obras necesarias para la conservación del inmueble y para el uso eficaz de los elementos comunes serán acordadas por la mayoría de los titulares.") y el Art. 38(h), 31 L.P.R.A. sec. 1293b(h) ("Corresponde al Consejo de Titulares: […] Intervenir y tomar decisiones sobre aquellos asuntos de interés general para la comunidad así como tomar aquellas medidas necesarias y convenientes para el mejor servicio común.")

Los acuerdos tomados a estos efectos son actos administrativos, por lo que basta la concurrencia de una mayoría de los condóminos para su aprobación. No se limitan tampoco a obras de construcción, como concluyera el Tribunal de Circuito de Apelaciones, sino también comprenden esquemas organizativos, como procedimientos de concesión de permisos o designaciones de turnos para el uso de un elemento común. Así lo entiende Batlle Vázquez, quien indica:

> También reputamos actos administrativos sometidos al régimen precitado de mayoría los que se refieren a […] **la designación de turnos o partes para el uso del tendedero común, lavadero o dependencias análogas que existan para uso de todos los habitantes de la casa** […]. Batlle Vázquez, <u>supra</u>, pág. 122. (Énfasis suplido).

Igualmente, y aún más directamente ligado a la controversia ante nos, el Prof. Michel Godreau aplica este principio al contexto análogo que representa el Art. 14 de la Ley de Propiedad Horizontal, 31 L.P.R.A. sec. 1291*l*. Reza dicho Artículo:

> Cada titular podrá usar de los elementos comunes conforme su destino, sin impedir o estorbar el legítimo derecho de los demás.

> Cuando el estacionamiento fuere elemento común, todo titular tendrá derecho a hacer uso de un espacio de estacionamiento con capacidad para acomodar un automóvil por cada apartamento de que fuere propietario que estuviere ocupado. Ningún titular podrá hacer uso de un espacio de estacionamiento que exceda aquella cabida, si con ello priva a otro titular del disfrute efectivo de tal elemento común. Si el número de espacios de estacionamiento con capacidad para acomodar un automóvil fuere menor que el número de apartamentos, tales espacios serán ocupados por los titulares que primero arriben al área de estacionamiento.

En casos en que el número de estacionamientos sea menor que el número de apartamentos, sostiene el Prof. Godreau, debe permitirse que el Consejo de Titulares explore maneras alternas al Art. 14 para distribuir los espacios. Propone como ejemplo "[u]n sistema de sorteo equitativo, según el cual se otorgue el uso de los espacios por un periodo de tiempo limitado". M. Godreau, <u>El Condominio</u>, pág. 103. Por su relevancia al caso de autos, nos permitimos citar su exposición en su totalidad.

> El segundo párrafo del citado artículo 14, § 1291*l*, establece un orden de prioridad en aquellos casos donde, (1) es común el área de estacionamiento y (2) hay menos espacios que apartamentos.

> En estos casos el uso del espacio es del primero que llegue. Estimamos que esta disposición es susceptible de enmienda vía reglamento **o por acuerdo mayoritario de los titulares**. La aplicación estricta del principio "primero en tiempo primero en derecho" puede resultar en graves injusticias, si se considera que los distintos horarios de trabajo de los residentes pueden hacer que un mismo grupo de condóminos acapare siempre el reducido número de

espacios. Un sistema de sorteo equitativo, según el cual se otorgue el uso de los espacios por un periodo de tiempo limitado, serviría para lograr una mejor distribución del disfrute limitado de espacios de estacionamiento.

Esta solución nos parece también de aplicación a aquellos condominios que, aun cuando su espacio de estacionamiento no es común, deciden habilitar parte de las áreas comunes como espacio adicional de estacionamiento. La interpretación de este artículo 14 como disposición mandatoria, es decir, no susceptible a enmienda por el Consejo de Titulares, podría dar lugar a abusos, pues le resultaría muy fácil a quien poseyera más de un vehículo —como es frecuente en muchos condominios— acaparar uno de los espacios colocando allí el segundo o tercer vehículo, es decir, procurando "llegar siempre primero". De ahí que nos parezca más justo permitir que el Consejo de Titulares disponga otro arreglo, dentro de sus prerrogativas para **decidir por mayoría** todo lo que sea conveniente para el servicio común, acorde con el artículo 38, § 1293b, inciso (g). Godreau, <u>supra</u>, págs. 102–103 (Énfasis suplido).

Aunque en el caso de autos estaba en controversia el uso de estacionamientos de visitantes y no el de residentes, es evidente que, al tratarse de un área común en la que las plazas de aparcamiento eran menores que el número de apartamentos, la situación atendida por el Art. 14 y la doctrina científica es perfectamente análoga.

C

Por último, como excepcional acepción tercera, la Ley reconoce "[e]l <u>uso extraordinario</u> que, dentro de peculiares criterios de normalidad, es dable obtener del inmueble, en función del cual se atribuye a algunos titulares una cuota de mantenimiento superior o inferior" (Énfasis en original). El Art. 38 de la Ley, en su inciso (e), 31 L.P.R.A. sec. 1293b(e), permite al Consejo de Titulares remediar la inequidad que presenta el uso desigual y desmedido de un elemento común por uno de los condóminos al:

[i]mponer mediante el voto afirmativo de la mayoría de los titulares, una cuota especial: (i) al titular del apartamento cuyos ocupantes o visitantes, sin impedir o estorbar el legítimo derecho de los demás titulares, regularmente, hagan uso tan intenso de cualquier elemento común, que los gastos de operación, mantenimiento o reparación de dicho elemento común sobrepasen los que razonablemente deban incurrirse en el uso normal y corriente de la referida facilidad, (ii) al titular del apartamento que por la naturaleza de la actividad que legítimamente lleva a cabo en su apartamento, conforme al destino que le ha sido asignado al mismo en la escritura de constitución, ocasione unos gastos comunes mayores a los que habría que incurrir si en el apartamento en cuestión no se llevase a cabo la referida actividad. La cantidad impuesta para cubrir el importe del exceso de gastos de referencia se añadirá y será exigible como parte de los gastos comunes atribuibles a dicho apartamento.

Bajo esta acepción del concepto de uso, contenida en el citado artículo, el Consejo de Titulares podría imponer a un condómino que emplee un elemento común con intensidad considerablemente mayor que los demás, una cuota especial mientras dure el superávit de uso, independientemente de las circunstancias que causaron la desproporción. Así, a un titular agraciado en un sorteo para ordenar el uso de ciertos elementos comunes, podría condicionársele el ejercicio de su privilegio al pago de una cuota especial.

Entendidos estos conceptos, apliquémoslos a los hechos en cuestión.

III

Por si solo, el esquema de sorteo aprobado por el Consejo de Titulares del Condominio Playa Grande no transformó el elemento común del estacionamiento en uno común

limitado, pues meramente estableció el orden en que los titulares habrían de disfrutar del elemento común, sin hacer atribuciones de titularidad o alteraciones en la escritura matriz. El cobro de una cuota especial para el uso de los estacionamientos tampoco violaba el orden jurídico, pues se ejercitaba así el poder del Consejo de Titulares frente a los titulares que, durante seis meses, por razón de resultar agraciados en el sorteo, regularmente usarían los espacios de aparcamiento de visitantes con mayor intensidad que los demás condóminos. **La nulidad del acuerdo recae en la cláusula de la Resolución del Consejo que autorizaba a los titulares agraciados a usar dichos espacios para el estacionamiento de automóviles que no eran de visitantes al Condominio. Veamos.**

Según consta en su propia resolución del 18 de febrero de 1987, el Consejo amparó su curso de acción en nuestra decisión de Pellón v. O'Clare, 98 D.P.R. 692 (1970). Allí, además de resolver que la naturaleza común o privada de un espacio de estacionamiento depende de lo establecido en la escritura matriz, indicamos que independientemente de la naturaleza del elemento, la mayoría de los titulares puede realizar obras que tengan "el propósito de hacer posible el uso eficaz de los espacios destinados a garajes." Pellón v. O'Clare, supra, 698.

No obstante, cualquier acuerdo al que hubiera llegado el Consejo debía salvaguardar el tipo de uso al que originalmente se había destinado el elemento común. En el caso de autos, la escritura matriz del Condominio Playa Grande indicaba claramente que los estacionamientos en cuestión estaban destinados al estacionamiento de visitantes al condominio. Podían entonces usarse únicamente para el aparcamiento de visitantes, no para el de automóviles particulares de residentes del condominio. Cualquier cambio en cuanto a su destino requeriría el consentimiento unánime de los titulares del condominio.

El esquema aprobado por el Consejo de Titulares, sin embargo, tuvo el efecto de transformar el uso de un área destinada al estacionamiento de visitantes a una de estacionamiento de residentes, quienes habrían de determinar como se usaría el espacio de aparcamiento que les había sido asignado. Se contravenía así la escritura matriz, que señalaba que el área en cuestión sólo podía emplearse para el estacionamiento de visitantes al condominio, no de residentes.

A modo de ejemplo, un área de reuniones de un condominio, así inscrita en la escritura matriz del inmueble, podría arrendarse a un titular para la celebración de una actividad social, pero no para el establecimiento de un comercio. Del mismo modo, el Consejo de Titulares podría establecer un orden en el uso de los estacionamientos comunes de visitantes, incluso asignando turnos mediante un sorteo, siempre que se mantuviera su uso exclusivo para los visitantes al condominio.

En resumen, a la luz de lo dispuesto en la Ley de Propiedad Horizontal, no es el esquema de sorteo lo que hace jurídicamente inaceptable el acuerdo al que llegara el Consejo de Titulares del Condominio Playa Grande, sino la alteración del tipo de uso

al que estaba destinado el elemento en cuestión, viz. un estacionamiento <u>de visitantes</u>. Por entender que ésta, y no otra, es la norma que debe sentarse en este caso, no podemos suscribir la Opinión del Tribunal.  Concurrimos.




                         FEDERICO HERNÁNDEZ DENTON
                              Juez Asociado