

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Miguel A. Pereira Suárez<br><br>Recurrido<br><br>v.<br><br>Junta de Directores del Condominio Ponciana<br><br>Peticionario<br><br>Crown Castle International Corporation de Puerto Rico<br><br>Interventora - Peticionaria | Certiorari<br><br>2011 TSPR 102<br><br>182 DPR \_\_\_\_ |

Número del Caso: CC - 2008 - 1014

Fecha: 30 de junio de 2011

Tribunal de Apelaciones:

Región Judicial de Ponce Panel XI

Juez Ponente:

Hon. Ismael Colón Birriel

Abogados de la Parte Peticionaria:

Lcdo. Rafael E. Mullet - Sánchez
Lcda. Jane Patricia Van Kirk

Abogados de la Parte Recurrida:

Lcdo. Ronald Riera Acosta
Lcdo. Luis Ángel Velazquez Mass

Materia: Impugnación de Actos, Junta de Directores

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Miguel A. Pereira Suárez

     Recurrido

        v.

Junta de Directores del     CC-2008-1014
Condominio Ponciana

     Peticionario

Crown Castle International
Corporation de Puerto Rico

  Interventora-Peticionaria

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 30 de junio de 2011.

En esta ocasión debemos interpretar el alcance del Art. 42(c) de la Ley de Condominios, Ley Núm. 103 de 5 de abril de 2003, 31 L.P.R.A. sec. 1293f. Nos corresponde resolver si el término de prescripción de dos años estatuido allí aplica para impugnar actos aprobados sin seguir el requisito de aprobación por unanimidad de los condóminos, como requiere la ley. Analizaremos específicamente si la impugnación del acuerdo suscrito entre el Presidente del Condominio Ponciana y Crown Castle International Corp. of PR (Crown Castle) había prescrito al momento en que el recurrido lo cuestionó. Evaluada la controversia, resolvemos en la afirmativa.

I

El Condominio Ponciana es un edificio de naturaleza mixta, ya que se compone de apartamentos comerciales y residenciales. Los hechos que dan origen a esta controversia surgen luego de que el 19 de marzo de 1999 el Sr. Ángel M. Llavona Folguera, Presidente de la Junta de Directores del Condominio Ponciana, suscribió un contrato de arrendamiento con la compañía Crown Castle para la construcción, mantenimiento y operación de instalaciones de telecomunicaciones en la azotea del Condominio Ponciana por un término de veinticinco años, prorrogable a veinticinco años adicionales. El contrato suscrito le daba el uso exclusivo e ilimitado de la azotea por un canon mensual de $700, con un aumento anual de 3%. Según surge del expediente, para otorgar ese contrato el señor Llavona Folguera no consultó al Consejo de Titulares. También, para la misma fecha, el señor Llavona Folguera arrendó a Crown Castle un apartamento de su propiedad para que colocara allí equipo de comunicación desde el que operaría el equipo instalado en la azotea.

El recurrido, Sr. Miguel A. Pereira Suárez, es titular del *Penthouse* 12-A del Condominio Ponciana. El señor Pereira Suárez alega que expresó en varias ocasiones, formal e informalmente, su descontento con la instalación del equipo en la azotea del edificio, alegadamente, tan pronto se enteró de ello. Sin embargo, no obra en el expediente documento alguno que acredite que el recurrido haya manifestado su inconformidad con el

equipo instalado. Incluso, no se acompañó copia del libro de actas del condominio en el que se detallan los pormenores de las supuestas reuniones celebradas entre la Junta de Directores y el Consejo de Titulares.

Surge del alegato de réplica del señor Pereira Suárez ante este Tribunal que alegadamente el 3 de enero de 2003 presentó una primera querella ante el DACO (número 600004623) sobre impugnación de los actos de la Junta de Directores del Condominio Ponciana. Sin embargo, aparentemente el 30 de junio de 2004 el DACO ordenó el cierre de archivo sin perjuicio de la querella por **falta de trámite.** Posteriormente, el DACO rechazó una moción de reconsideración por presentarse fuera del término dispuesto. Incluso, en su alegato de réplica, el señor Pereira Suárez admite que **"esta información no surge de las determinaciones de hechos de DACO,** pero fue un hecho discutido por la Junta de Directores del Condominio Ponciana ante el Tribunal de Apelaciones, según lo menciona la propia parte interventora-Peticionaria, página 13, nota 2 de la Petición de Certiorari." Alegato de Réplica, pág. 9. Ciertamente, en su petición de *certiorari*, la peticionaria Crown Castle discutió este hecho, pero lo rechazó precisamente en la nota al calce número dos de su alegato. Específicamente, en la mencionada nota Crown Castle aduce que

> [e]n un escrito presentado por la parte querellada Junta de Directores del Condominio Ponciana, ante el TA, se indica que Pereira había presentado una querella ante DACO el 3 de enero de 2003. **Hasta ese momento Crown Castle no**

**tenía conocimiento de la misma, ya que nunca se hizo alusión a ella en todo el curso de los procedimientos en que Crown Castle ha participado, y no forma parte del record del caso".** (Énfasis nuestro).Petición de *certiorari*, pág. 13, n.2.

No hay nada en el apéndice ni el legajo acerca de esa querella.

Pasados seis años de la celebración del contrato, el 2 de septiembre de 2005 el recurrido presentó la querella que nos ocupa, ante el Departamento de Asuntos del Consumidor (DACo). En síntesis, solicitó que se ordenara a la Junta de Directores la resolución y cancelación del contrato de arrendamiento; que Crown Castle removiera a su costo las antenas instaladas en la azotea del edificio; que desalojara el cuarto de máquinas de control que le arrendó al señor Llavona Folguera; que devolviera a su estado original el área de la azotea; que se ordenara a la Junta de Directores y al Administrador aplicar, conforme al porcentaje de participación en los elementos comunes y las derramas que se establezcan, el canon mensual correspondiente a Crown Castle; y que le ordenara el pago de honorarios de abogados.

Crown Castle presentó una moción de desestimación y solicitud de intervención. En ésta solicitó la desestimación de la querella en su contra por falta de jurisdicción. Especificó que no recibió notificación de la querella hasta febrero de 2007. Sin embargo, requirió que se le permitiera participar en los procedimientos como interventor, ya que tenía un interés propietario creado en

virtud de los contratos en los que Pereira Suárez solicitaba la resolución y en la propiedad que se quería remover del Condominio Ponciana. Asimismo, arguyó que la acción de impugnación presentada por el recurrido estaba prescrita toda vez que la querella se presentó seis años después de celebrado el contrato e instalado el equipo, y pasados tres años de la alegada reunión del Consejo de Titulares en la que se ordenó a la Junta de Directores cancelar el contrato en cuestión.

Luego de que el DACo celebró una vista administrativa, las partes presentaron sus correspondientes memorandos de derecho. A la vista comparecieron la parte querellante (señor Pereira Suárez), la parte querellada (Junta de Directores del Condominio Ponciana) y Crown Castle (parte interventora), todos acompañados de sus respectivos representantes legales.

El 1 de noviembre de 2007 el DACo emitió una resolución. En sus determinaciones de hechos, el DACo tomó como ciertas las alegaciones contenidas en las actas de las distintas asambleas de titulares que se llevaron a cabo luego de la celebración del contrato. De estas actas surgía que la primera asamblea de titulares fue celebrada el 24 de abril de 2001, es decir dos años y un mes después de la otorgación del contrato en controversia. Posteriormente, el 27 de noviembre de 2001, se llevó a cabo una segunda asamblea extraordinaria del Consejo de Titulares. Allí, se discutieron los pormenores del proceso de instalación de las antenas y se cuestionó la forma en

que se llevó a cabo la contratación. Además, se discutió que el contrato suscrito nunca contó con la aprobación del Consejo de Titulares y que el señor Llavona Folguera actuó en atención a sus intereses personales pues le había arrendado un apartamento de su propiedad a Crown Castle en el mismo edificio por la cantidad de $1,300 mensuales.

Durante esa reunión, aparentemente también se llevó a cabo una votación para auscultar si el Consejo de Titulares deseaba que se quedaran las antenas en la azotea. Se decidió, mediante votación de 15 a favor y 5 en contra, que se mantuvieran las antenas en la azotea. Sin embargo, existe conflicto en cuanto a la veracidad de este acuerdo. El recurrido Pereira Suárez alega que en la reunión no se consiguieron los votos para que se mantuvieran las antenas. De las determinaciones de hechos de la resolución también se desprende que en diciembre de 2001 se celebró otra reunión en la que aparentemente la Presidenta de la Junta de Directores señaló que se acataría la decisión del Consejo de Titulares de solicitar a Crown Castle la remoción de las antenas colocadas. Sin embargo, Crown Castle se opuso debido a los gastos invertidos en su instalación. Finalmente, surge de la resolución que en el 2002 hubo otra asamblea para discutir la posibilidad de aumentar el canon que pagaba Crown Castle por mantener el equipo de telecomunicaciones en la azotea del edificio.

A la luz de la prueba presentada, el DACo declaró nulo el contrato suscrito entre el señor Llavona Folgera y

Crown Castle. Ordenó la celebración de una asamblea extraordinaria en la que se discutiera y decidiera, por unanimidad, si se ratificaba o no el contrato otorgado y la posibilidad de imponer una cuota especial a los titulares de apartamentos comerciales. Señaló que de no ratificarse el contrato, Crown Castle debía remover el equipo instalado en la azotea. Entendió la agencia que como el contrato en cuestión le otorgaba a Crown Castle el uso exclusivo e ilimitado de la azotea, ello significó la alteración del uso y destino de un elemento común. Por lo tanto, se requería el consentimiento unánime del Consejo de Titulares. Por ende, concluyó que se violaron los Artículos 2 y 11 de la Ley de Propiedad Horizontal vigente en aquel entonces, Ley 104 de 25 de junio de 1958, según enmendada por la Ley Num. 157 de 4 de junio de 1976. Por último, impuso honorarios de abogado a la parte querellada y apercibió de la imposición de multas administrativas de no cumplirse con lo ordenado.

Crown Castle presentó un recurso de revisión judicial ante el Tribunal de Apelaciones. Alegó que la agencia erró al no declarar prescrita la acción de impugnación y al concluir que el contrato alteraba el uso y destino de la azotea, aunque ello no se sostenía de la prueba desfilada.

El foro apelativo intermedio confirmó la resolución y orden del DACo. El Tribunal de Apelaciones concluyó que "[l]a actuación unilateral y *ultra vires* de la Junta de Directores del Condominio Ponciana es nula en derecho al no contar con el consentimiento unánime de los titulares

por lo cual no se activa ningún término prescriptivo para reclamar su corrección". En esencia, el foro apelativo intermedio entendió que el arrendamiento de un elemento común de un condominio residencial para fines comerciales constituye un acto que altera su uso y destino. Por ello, fundamentándose en Rivera Rodríguez v. Junta Dir. I y II, 173 D.P.R. 475 (2008), y en el Reglamento del Condominio Ponciana, el Tribunal de Apelaciones concluyó que aunque la Junta de Directores tenía la facultad para colocar equipo como el instalado en áreas comunes del condominio con el consentimiento unánime del Consejo de Titulares, eso no significaba que se podía ceder ese derecho a personas ajenas al condominio. Por consiguiente, como era necesaria la anuencia de todos los titulares para llevar a cabo el arrendamiento, el contrato en cuestión es nulo, es decir, nunca nació a la vida jurídica.

Inconforme nuevamente, Crown Castle presentó un recurso de certiorari ante este Tribunal. Alegó que el foro apelativo intermedio erró al no considerar los argumentos de prescripción de la acción de impugnación y al confirmar que el contrato de arrendamiento alteró el uso y destino de la azotea. Por último, añadió que el Tribunal de Apelaciones erró al aplicar la norma de Rivera Rodríguez v. Junta Dir. I y II, supra.

El 1 de mayo de 2009 expedimos el auto. Con el beneficio de los alegatos de ambas partes procedemos a resolver.

II-A

"Con miras a atacar de frente las situaciones indeseables que surgían a base de la legislación anterior, el legislador dispuso en el Art. 44 de la Ley Núm. 103 de 5 de abril de 2003, 31 L.P.R.A. sec. 1291 nota, que "[e]sta Ley entrará en vigor noventa (90) días después de su aprobación **y sus disposiciones regirán a todo inmueble sometido al régimen de Propiedad Horizontal, cualquiera que sea el momento en que fuera sometido a dicho régimen.**" Precisamente por la necesidad de "alcanzar la transformación de situaciones jurídicas indeseables" se dispuso para el alcance retroactivo de esta Ley. Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101, 107 (2006). "De otra forma la sociedad estaría atada a perpetuidad a normas que impiden su desarrollo." Id., págs. 107-108. Por ello, como señalamos en Consejo Titulares v. Williams Hospitality, id., pág. 110, y reafirmamos recientemente en S.L.G. Vázquez, Ibáñez v. De Jesús, Vélez, Op. de 14 de diciembre de 2010, 2010 T.S.P.R. 227, 2010 J.T.S. 236, 180 D.P.R. __ (2010) "*[n]o aplicar la Ley Núm. 103, supra, a controversias como la de autos equivaldría a laurear actuaciones que el estado de derecho vigente conjura; estaríamos incumpliendo, entonces, con la intención legislativa. Por lo tanto, resolvemos que, en virtud de su tenor más razonable y de las poderosas razones de orden público que movieron al legislador a materializarla, la Ley Núm. 103, supra, aplicará retroactivamente.*" (Énfasis en el original.)

Cónsono con lo anterior, a pesar de que la actual controversia surgió mientras aún se encontraba vigente la anterior Ley de Propiedad Horizontal, la letra del Art. 44, supra, así como la interpretación que hemos hecho de la retroactividad de esta ley, nos obliga a analizar este caso a la luz de la Ley de Condominios vigente. Aclarado esto, procede evaluar las disposiciones de la Ley de Condominios de 2003 que regulan la impugnación sobre violaciones a la escritura matriz, al reglamento y a los cambios o actos que requieran unanimidad.

B

El Art. 42 de la Ley de Condominios, supra, gobierna la impugnación de los acuerdos y las determinaciones del Consejo de Titulares. Asimismo, establece el término que tiene el titular afectado para llevar a cabo dicha impugnación. El inciso (a) procura

> reducir el número de querellas ante el foro administrativo, al requerir del querellante que ventile primero ante los organismos internos del condominio, bien ante la propia Junta o ante un Comité de Conciliación, cualquier querella en la que se cuestione una acción u omisión del Administrador o de la propia Junta.
>
> M. Godreau, La Nueva Ley de Condominios, Ed. Dictum, San Juan, 2da ed., 2003, pág. 40.

Con este procedimiento se persigue "acreditar ante la agencia que se le hizo el planteamiento ante el organismo interno y que éste, o no lo atendió oportunamente, o si lo atendió se ratificó en la acción o en la omisión que el titular entiende le es gravemente perjudicial". Id.

> La presentación de la reclamación internamente tendrá que hacerse dentro del

término de treinta (30) días de conocida la acción u omisión que se impugna. La Junta o el Comité de Conciliación en su caso tendrán treinta (30) días para resolver el asunto. Si el titular considera adversa la decisión de la Junta o del Comité, podrá entonces recurrir al DACO. De igual Forma, si la Junta o el Comité no toman acción dentro de los sesenta (60) días desde que el titular sometió su queja, puede éste recurrir a la agencia con su querella. El DACO se reserva la facultad de eximir al titular de agotar este procedimiento, si así lo ameritase la naturaleza del caso.

Id.

En cuanto al término de prescripción para ejercer la acción, el inciso (c) del Art. 42 señala:

(c) La acción de impugnación de acuerdos, acciones u omisiones de la Junta de Directores, del Consejo de Titulares, con excepción de los realizados por el titular que somete el inmueble al régimen, que violen las disposiciones de esta Ley, de la escritura matriz o del Reglamento del condominio, **prescribirá a los dos (2) años de haberse notificado el acuerdo, tomado la acción o de conocerse la omisión.** Para los titulares que impugnen este tipo de acuerdo del Consejo de Titulares, el término se computará a partir de la notificación del mismo, siempre y cuando cumplan con los requisitos establecidos en el párrafo siguiente.

Al ejercitar la acción de impugnación de acuerdos del Consejo de Titulares, el titular deberá acreditar que estuvo presente o representado en la reunión en que se tomó el acuerdo que impugna y que no votó a favor del mismo. Si estuvo ausente a pesar de que fue debidamente notificado deberá probar que su ausencia estuvo justificada.

...........................(Énfasis suplido.)

Finalmente, el inciso (e) del Art. 42 indica:

(e) El foro de instancia en el que se diluciden las querellas o acciones presentadas por los titulares o por el Consejo de Titulares le impondrá a la parte que hubiese procedido con temeridad el pago de los gastos del pleito o de la querella, así como el pago de una suma

razonable por los honorarios de abogados en que realmente hubiese incurrido la parte que obtuvo el remedio solicitado. Sólo mediante la renuncia expresa de la parte vencedora podrá dispensarse a la otra parte del pago de honorarios. El titular que prevalezca en cualquier reclamación de su querella no tendrá que contribuir a los honorarios o gastos legales en que incurra la Junta o el Consejo de Titulares, ni a la multa que, en su caso, pudiera imponérsele a la parte querellada.

Las leyes antecesoras a nuestra actual Ley de Condominios no establecían un término de prescripción para la impugnación de las acciones tomadas por la Junta de Directores o el Consejo de Titulares. Así, por ejemplo, la Ley Núm. 104 de 25 de junio de 1958 facultaba para la impugnación "cuando no se re[unía] el quórum necesario para tomar acuerdos. El mismo artículo facultaba también la impugnación de las acciones de la Junta de Administración si éstas no cumplían con las reglas acordadas para la buena administración". M.J. Godreau, El Condominio: El Régimen de Propiedad Horizontal en Puerto Rico, 1ra ed., Río Piedras, Ed. Dictum, 1992, pág. 129.

La reforma hecha en el 1976 al régimen de propiedad horizontal amplió el "artículo 42 para especificar ciertos términos y para distinguir entre condominios dedicados a comercios o establecimientos no residenciales y aquellos en que por lo menos hubiera un apartamiento dedicado a vivienda". Id. A esos efectos la ley impuso un término de 30 días para "la impugnación de acuerdos y determinaciones, que el titular estimase **gravemente perjudiciales** para él o para la comunidad de titulares". Id., pág. 202. Véase la Ley Núm. 157 de 4 de junio de

1976.[1] Ahora bien, dicho término se limitaba únicamente a acciones que fueran gravemente perjudiciales para el que las impugnaba o para la comunidad de titulares. Ello fue razón para que el legislador entendiera necesario modificar este artículo en el 2003.

C

Las enmiendas introducidas al régimen de propiedad horizontal en el 2003 respondieron, en esencia, a la necesidad de realizar "ajustes para dotarlo de mayor eficacia en la consecución de sus metas originales, a saber hacer viable el derecho a la propiedad individual sobre un apartamiento dentro de un edificio o estructura arquitectónica, a fin de aprovechar al máximo el escaso terreno con que contamos". Exposición de Motivos de la Ley Núm. 103, supra. Cimentándose en las características principales que gobiernan el régimen de propiedad horizontal, "particularmente la reiteración de que el apartamiento es el centro del régimen, la exigencia de la buena fe, así como la prohibición de actuar caprichosamente en el ejercicio de los derechos dominicales", el legislador, entre otras cosas, fijó un término prescriptivo

---

[1] El foro donde se presentaba la impugnación dependía de la naturaleza del condominio en cuestión, a saber, residencial o comercial. En los condominios no residenciales los acuerdos se tenían que impugnar en el Tribunal Superior. También se requería que el titular que impugnara asistiera a la reunión en la que se tomó la decisión y se opusiera. Si se ausentó debía presentar razones que justificaran su ausencia. En cambio, cuando se trataba de condominios con viviendas las impugnaciones debían ventilarse en el DACo y eran revisables por el Tribunal Superior.

de dos años para presentar las impugnaciones de acciones u omisiones por violaciones a la Ley o al Reglamento. Íd. Ello tuvo el fin de armonizar las distintas disposiciones de la ley con los principios que se pretenden salvaguardar en el Art. 1-A, 31 L.P.R.A. sec. 1291 nota[2]: la buena fe, la prohibición de ir en contra de los actos propios y la prohibición del abuso del derecho.

Como explica el profesor Michel Godreau en su obra La Nueva Ley de Condominios:

_____

[2] "Art. 1-A. Propósito

Esta Ley se aprueba con el propósito de viabilizar la propiedad individual sobre un apartamiento, que forma parte de un edificio o inmueble sometido al régimen de propiedad horizontal, de acuerdo a los criterios que más adelante se establecen.

El titular de un apartamiento sometido al régimen de propiedad horizontal, tiene el derecho al pleno disfrute de su apartamiento y de las áreas comunes, siempre que con ello no menoscabe el derecho de los demás titulares al disfrute de sus respectivas propiedades.

El Consejo de Titulares, la Junta de Directores y el Agente Administrador del condominio, tienen como deber primordial orientar sus acciones salvaguardando el principio de que el propósito del régimen de propiedad horizontal es propiciar el disfrute de la propiedad privada sobre el apartamiento y que la administración de las áreas y haberes comunes del edificio se realiza para lograr el pleno disfrute de este derecho. Correlativamente cada titular reconoce que el ejercicio del dominio en el régimen de propiedad horizontal está limitado por los derechos de los demás condóminos y que el derecho de propiedad sobre su apartamiento tiene que ejercerse dentro del marco de la sana convivencia y el respeto al derecho ajeno.

En el ejercicio y el reclamo de sus derechos, los titulares actuarán conforme a los principios de la buena fe, de la prohibición de ir en contra de sus propios actos y la del abuso del derecho."

Bajo la ley de 1976 no había límite de tiempo para cuestionar la validez de este tipo de acto o gasto, esta falla permitió en varios casos que un titular, que había presenciado y tolerado por años un cambio de fachada o el cambio de destino de determinada área en el inmueble, luego presentara querellas contra todos, alterando así la estabilidad del régimen ¿si por largos años nadie ha tomado acción ante determinado cambio evidente, no es de presumir que todos a la larga han **aceptado** la alteración? No se trata aquí de convalidar por el transcurso del tiempo actuaciones o acuerdos que la ley no permite, ni siquiera mediando el consentimiento unánime. Este nuevo término de prescripción para las acciones, le impone a los titulares la responsabilidad de actuar diligentemente en la defensa de su propiedad, porque de lo contrario se interpretará que consintieron al cambio. (Énfasis en el original.)

M. Godreau, La Nueva Ley de Condominios, op. cit., págs. 29-30.

En el Informe Conjunto del Proyecto del Senado 1425 de las Comisiones de Vivienda, Banca, Asuntos del Consumidor y de lo Jurídico del Senado, de 12 de noviembre de 2002, 4ta Sesión Ordinaria, 14ta Asamblea Legislativa, se explicó que la ausencia de un término en el Art. 42, supra, "se ha prestado a que se hayan admitido querellas luego de haber transcurrido décadas de establecido el cambio o la violación impugnada. Esto no sólo acarrea inestabilidad e inseguridad, sino que puede alterar seriamente el delicado balance de la convivencia". Las comisiones tomaron en consideración que "[n]i en la práctica administrativa del DACo ni en los pronunciamientos del Tribunal Supremo se ha reconocido la importancia que merece en el régimen el principio del reclamo diligente de los derechos, encarnado en la figura de la incuria y en las doctrinas del consentimiento tácito

y del impedimento de ir en contra de los propios actos".

Id. El establecimiento de un término de dos años viene a

reforzar la promulgación para el régimen de los principios

generales del derecho enunciados en el Art. 1-A, supra.

En iguales términos se expresó la Comisión de

Desarrollo Urbano y Vivienda de la Cámara de

Representantes en su Informe de 3 de marzo de 2003 sobre

el P. del S. 1425, pág. 4:

> La ausencia de un término dentro del cual deban
> incoarse dichas acciones ha permitido en no
> pocos casos que un titular por razones ajenas al
> principio de la sana convivencia o de la defensa
> *bonafide* del derecho propietario y que ha
> presenciado por años un cambio de fachada o el
> cambio de destino de determinada área en el
> inmueble, de repente y respondiendo, por
> ejemplo, a una reciente animosidad contra algún
> titular o contra la Junta de Directores
> incumbente, invoque viejas violaciones a la Ley,
> a la Escritura Matriz o al reglamento, y
> presente querellas contra todos, alterando así
> la estabilidad del régimen. **Si los cambios
> efectuados no constituyeron violaciones a normas
> de derecho imperativo, es decir, si la propia
> Ley autorizaba que mediante el consentimiento
> unánime se hubiesen realizado los cambios que
> ahora se impugnan, no hay justificación para
> permitir querellas tardías.** Con ello se evitaría
> la forma de proceder en el reciente caso de
> Herbert Brown III v. Cond. Playa Grande, 2001
> JTS 83 [Brown III v. J.D. Cond. Playa Grande,
> 154 D.P.R. 225 (2001)], en el que se permitió
> impugnar un cambio de destino de determinada
> área de un estacionamiento, a pesar de que
> todos, incluido el querellante, habían venido
> disfrutando de dicho cambio por más de una
> década. Se evitaría, además, el caso todavía más
> injusto de permitirle a los adquirientes
> recientes que impugnen los cambios que los
> titulares anteriores habían aceptado tácitamente
> por décadas, trastocando así el ambiente de
> convivencia que pueda haber existido en un
> condominio por largos años. (Énfasis suplido.)

Como podemos observar, las enmiendas introducidas en

el 2003 al Art. 42, supra, persiguen precisamente frenar el

afán obstruccionista de algunos titulares que, por intereses particulares, ponen en juego la estabilidad de toda una comunidad. Como se señala en el Informe de la Comisión de Desarrollo Urbano y Vivienda de la Cámara, se estableció un término de prescripción para este tipo de reclamaciones luego de observar cómo los tribunales estaban manejando los asuntos en los que se impugnaban acuerdos del Consejo de Titulares. Un ejemplo de ello es el caso Brown III v. J.D. Cond. Playa Grande, supra, en el que declaramos nulo un acuerdo que alteró el uso y destino de las áreas del estacionamiento de visitantes a pesar de que la impugnación se realizó pasados once años de conformado el acuerdo. Partiendo de la ley vigente en aquel entonces, resolvimos que aunque estaba permitido el cambio de elementos comunes generales a elementos comunes limitados, se requería el acuerdo unánime de todos los titulares. Íd., pág. 237. Por ello, como la resolución se aprobó únicamente por una mayoría, sin importar los años que hubiesen pasado, el acuerdo era nulo. La imposición de un término de prescripción en la Ley de Condominios de 2003 finalizaría con situaciones como esas.

Por otra parte, adviértase que con la imposición de ese término de prescripción no se cierra la puerta a la posibilidad de instar acciones de impugnación. Por el contrario, siempre y cuando éstas se presenten dentro del término de dos años que dispone el Art. 42 (c), supra, no habrá impedimento para la reclamación. Sin embargo, la situación es distinta cuando se trata de actos que estén

tajantemente prohibidos por la ley. En esas instancias estamos ante una actuación nula, no meramente anulable, y por eso no hay término prescriptivo para incoar la acción. Es decir, "el cambio de destino de determinada área en un condominio, como sería destinar como área de uso general para los residentes el área originalmente designada como estacionamiento de visitantes, no es un cambio ilegal, pues la Ley lo permite, si media el consentimiento unánime…". Informe Conjunto al Senado sobre el P. del S. 1425 de 12 de noviembre de 2002, supra, pág. 33. Empero, "la destinación a un particular de un elemento común necesario, por ejemplo, no puede realizarse ni siquiera con el consentimiento unánime expreso, porque atenta contra el régimen mismo. Para la impugnación de este tipo de violación a una norma de derecho imperativo (*jus cogens*) no hay término de caducidad". Íd.

En España, la Ley de Propiedad Horizontal dispone de un término de **caducidad** para las acciones de impugnación de la Junta de Propietarios. Así, en el Art. 18 de la Ley de Propiedad Horizontal española se dispone que

> el plazo para impugnar acuerdos caduca (se termina) a los tres meses de adoptarse el acuerdo por la Junta de Propietarios salvo si se trata de actos contrarios a la Ley o a los estatutos (si los hay) pues entonces el plazo es de un año (desde que se adoptó el acuerdo).
>
> J Zaforteza Socías, La nueva propiedad horizontal, Barcelona, Ed. J.M. Bosch, 2002, pág. 112.

Sobre este artículo los tratadistas comentan que

> Tras la reforma de 1999 se da una nueva redacción al antiguo artículo 16 LPH, cuyo

contenido se recoge, ahora, entre los actuales artículos 17 y 18 LPH. De la lectura de estos artículos, y sobre todo del 18 LPH, ya no cabe duda alguna de que los acuerdos contrarios a la LPH son meramente anulables, impugnables.

D. Morales Martínez, <u>Propiedad Horizontal. ¿Nulidad o Anulabilidad de los Acuerdos Contrarios a la LPH o los Estatutos?</u>, 81 Revista Crítica de Derecho Inmobiliario 2081, 2086 (2005).

Por consiguiente, según la Ley de Propiedad Horizontal española todos los acuerdos comunitarios que la ley permite impugnar son meramente anulables y no nulos. "[L]a nulidad radical sólo operará, como dice la STS de 23 de julio de 2004, respecto de aquellos acuerdos que 'violan disposiciones legales imperativas o prohibitivas que no tengan establecido un efecto distinto en caso de contravención, y también si resultan contrarias a la moral, al orden público o impliquen fraude de ley'". <u>Íd.</u>[3] Esta línea de interpretación

está orientada a sostener un criterio flexible interpretativo, que alcanza pleno sentido y amparo interpretativo correcto en la procura de una convivencia normal y pacífica, tratándose de evitar y menos fomentar las frecuentes guerras de comunidades con la alteración inevitable de la convivencia que ha de estar presidida por la idea de justicia y la atención a las necesidades efectivas de la comunidad, debiendo predominar sobre empeños y caprichos personales o actuaciones egoístas y abusivas por falta de justificación racional, conforme a una adecuada aplicación sociológica... o teniendo en cuenta la doctrina de los actos de anulación....

Sentencia de 23 de julio de 2004, núm. 859/2004.

---

[3] Véanse a modo de ejemplo: Sentencia de 7 de octubre de 1999, Sentencias de 7 de marzo, 30 de abril, 2 y 5 de mayo, 2 de julio de 2002 y 23 de julio de 2004.

Como podemos observar, la Ley de Propiedad Horizontal española persigue el mismo objetivo que la nuestra: lograr la estabilidad y la convivencia cordial y pacífica entre los titulares. Asimismo, establece la distinción para las acciones de impugnación. Aquellos actos que sean contrarios a la ley son nulos y se podrán cuestionar en cualquier momento. Por el contrario, las impugnaciones de las acciones o acuerdos que la ley faculta a los titulares a realizar, se tendrán que disputar dentro del término ordenado.

Por otra parte, en la Ley de Propiedad Horizontal española se califica el término para la impugnación como de caducidad, a diferencia de nuestra ley, que lo denominó de prescripción. Esa distinción fue producto del proceso de enmiendas que sufrió la Ley Núm. 157 de 4 de junio de 1976. Originalmente, el legislador puertorriqueño dispuso que el término para la impugnación fuera de caducidad. P. del S. 1425 de 11 de abril de 2002, 3ra Sesión Ordinaria, 14ta Asamblea Legislativa, pág. 48.[4] Sin embargo, luego de

---

[4] El texto original del Art. 44(c) propuesto era:

> (c) La acción de impugnación de acuerdos, acciones u omisiones de la Junta de Directores, del Consejo de Titulares, o de cualquier titular, que violen las disposiciones de esta Ley, de la escritura matriz o del Reglamento del condominio, **caducará** a los dos (2) años de haberse notificado el acuerdo, tomado la acción o de conocerse la omisión. Para los titulares que impugnen este tipo de acuerdo del Consejo de Titulares, el término se computará a partir de la notificación del mismo, siempre y cuando cumplan con los requisitos establecidos en el párrafo siguiente. (Énfasis suplido.)

adoptar las recomendaciones de la Asociación de Apoyo a Condominios y del DACo se abandonó el término de caducidad y se legisló uno de prescripción. Íd. Esto constituye una gran diferencia.

"Los términos de caducidad y de prescripción tienen la misma finalidad y efecto: impedir que permanezcan indefinidamente inciertos los derechos y dar firmeza a las relaciones jurídicas." Muñoz v. Ten General, 167 D.P.R. 297, 302 (2006). Ahora bien, existe una crucial diferencia entre ambos. "[L]a prescripción, a diferencia de la caducidad, admite su interrupción o suspensión". Íd. Por consiguiente, "un término prescriptivo, en la medida en que se interrumpa oportunamente, puede ser indefinido, ya que su interrupción puede ocurrir en un número ilimitado de ocasiones". Íd. Por el contrario, "un término de caducidad no puede ser interrumpido o suspendido, por lo que éste siempre extingue el derecho a la causa de acción con el mero transcurso del tiempo". Íd.

Como es sabido, "[n]uestro ordenamiento jurídico permite que el término prescriptivo de las acciones quede interrumpido por una de tres (3) ocurrencias: el ejercicio de la acción ante los tribunales, la reclamación extrajudicial del acreedor, y por cualquier acto de reconocimiento de la deuda por el deudor". De León v. Caparra Center, 147 D.P.R. 797, 803 (1999). Véase, además, Art. 1873 del Código Civil, 31 L.P.R.A. sec. 5303.

"Consistentemente, hemos reiterado que nuestro ordenamiento jurídico no exige forma específica para

interrumpir la prescripción" mediante reclamación extrajudicial. De León v. Caparra Center, supra, pág. 804. Sin embargo, hemos señalado ciertos requisitos que debe cumplir una reclamación extrajudicial para que opere una interrupción de la prescripción. Primero, la reclamación debe ser oportuna, lo cual requiere que se realice antes de la consumación del plazo. En segundo lugar, la reclamación debe hacerse por el titular del derecho o acción cuya prescripción quiere interrumpirse. Tercero, se requiere idoneidad del medio utilizado para realizar la reclamación. Por último, debe existir identidad entre el derecho reclamado y aquel afectado por la prescripción. Íd., pág. 805. "En definitiva, la reclamación extrajudicial puede plasmarse a través de distintos actos, pero todos ellos han de cumplir con los requisitos genéricos de oportunidad, identidad, legitimación e idoneidad antes reseñados". Galib Frangie v. El Vocero de P.R., 138 D.P.R. 560, 568 (1995).

En cuanto a la prescripción extrajudicial, Albaladejo nos comenta que "con tal que sea … realmente reclamación … y no un mero recordatorio, puede revestir innumerables formas y consistir en cualquier tipo de comunicación, escrito, etc., o, en la gestión que sea, con tal que se haga patente la petición del derecho". M. Albaladejo García, Derecho Civil, 17ma ed., Madrid, Edisofer S.L., 2006, T. I, pág. 905. Es decir, debe ser una "petición que muestre inequívocamente el sujeto pasivo la decisión de obtener el pago". Íd. Al citar jurisprudencia española,

este autor señala que la norma de la reclamación extrajudicial

> se refiere a casos como presentación de la factura correspondiente (sentencia de 23 noviembre 1917), carta pidiendo el abono de los daños sufridos (sentencia de 11 febrero 1966 y 6 diciembre 1968), escrito recabando del representante legal del deudor (RENFE) la indemnización procedente (sentencia de 30 diciembre 1967), telegrama dirigido por el acreedor al deudor (sentencia de 11 febrero 1977), reclamación por carta (sentencia 21 noviembre 1997), reclamación administrativa del Ayuntamiento responsable de los daños que se pide se resarzan (sentencia de 14 julio 1998), etc.

En iguales términos se expresa Díez Picazo:

> El Código no requiere ninguna forma especial para que se entienda realizada la reclamación extrajudicial. No exige que conste en documento fehaciente aun cuando ello pueda resultar aconsejable. Reiteradamente se han tomado en consideración la correspondencia epistolar, la consignación de una queja en los libros de reclamaciones y los telegramas y cualquier otro medio de comunicación. No existe inconveniente tampoco en que la reclamación pueda ser puramente verbal… **Lógicamente habrá de ser objeto de prueba a quien pretenda que la reclamación se ha realizado y resulte favorecido por ella.**
>
> L. Díez-Picazo, <u>La Prescripción Extintiva en el Código Civil y en la Jurisprudencia del Tribunal Supremo</u>, 2da ed., España, Thomson Civitas, 2007, pág. 185.

Esa misma postura adoptamos en <u>Galib Frangie v. El Vocero de P.R.</u>, <u>supra</u>, pág. 568, al disponer que "[e]n cuanto a la reclamación extrajudicial, no hay relación limitativa hecha por la ley sobre qué actos son los que se incluyen en esta causa interruptiva, y admite como tales todos aquéllos en que la voluntad del acreedor quede patente. En cuanto a la forma de la reclamación la ley no

exige ninguna forma especial". Véase, además, Zambrana Maldonado v. E.L.A., 129 D.P.R. 740 (1992).

IV

Según surge del expediente, no fue hasta pasados seis años de la instalación del equipo en la azotea del edificio, que el recurrido se querelló ante el DACo. Aunque de la resolución de esa agencia se desprende que se celebraron varias asambleas de titulares en las que se discutieron los pormenores del contrato en cuestión, lo cierto es que en el expediente no se acompaña copia de ninguna de las actas que se redactaron luego de acaecidas las supuestas reuniones, ni mucho menos cartas del recurrido o de algún otro titular en la que manifestaran su preocupación con la instalación del equipo en la azotea. Según la resolución del DACo, antes del 24 de abril de 2001 no constaba en el libro de actas del condominio que se hubiera celebrado alguna reunión.

Tanto el recurrido como el Tribunal de Apelaciones razonaron que como el contrato en cuestión alteraba el uso y destino de un elemento común general, el consentimiento de todos los titulares era necesario. Por consiguiente, concluyeron que como no se obtuvo la aprobación unánime que exige la ley, el contrato es nulo y contra él no opera la prescripción del Art. 42(c) supra. No tienen razón.

El legislador fue enfático cuando aclaró que siempre que el acuerdo esté permitido por la ley, se podrá cuestionar en el plazo establecido en el Art. 42(c), id. Estamos ante una acción anulable, no nula de por sí como

serían los casos en los que la Junta de Directores o el Consejo de Titulares realizan un acto que es vedado por la ley.

Ahora bien, el titular que desee impugnar un acuerdo deberá ser diligente en procurar su derecho. Tendrá la obligación de ejercerlo o reclamarlo dentro del término de dos años que dispone el Art. 42(c), id., cuando se trate de acuerdos permitidos por la ley. Para ello es irrelevante si se requiere unanimidad o no. Sin embargo, cuando se trate de cuestionar acuerdos o acciones que la ley prohíbe totalmente no habrá obstáculos prescriptivos para ejercer la impugnación, independientemente del favor de los titulares.

En la situación particular que nos ocupa, estamos ante un acuerdo que la ley permite realizar, aunque con el consentimiento unánime de todos los titulares. Por ello, al acuerdo en cuestión le aplica el término de prescripción de dos años que dispone el Art. 42(c) de la Ley de Condominios, id.

Aunque reconocemos que las acciones de impugnación de acuerdos, acciones u omisiones de la Junta de Directores o del Consejo de Titulares admiten interrupción, igual que cualquier otro término prescriptivo, lo cierto es que en el expediente no se nos acompaña evidencia que nos permita concluir que el recurrido Pereira Sánchez interrumpió el término. Estamos de acuerdo con lo expresado en la opinión disidente de la Jueza Asociada señora FIOL MATTA, en cuanto a que el término prescriptivo de dos años dispuesto

en el Art. 42 (c) de la Ley Núm. 103, supra, se cuenta a partir de la fecha de su vigencia, es decir, a partir del 4 de julio de 2003. Ello es así porque, evidentemente, no podemos aplicarle a un acto que ocurrió con anterioridad a la vigencia de una ley un término que dispuso una ley posterior al evento, con el efecto de privar a una persona de una causa de acción antes de que pueda ejercerla. Véase Alicea v. Córdova, 117 D.P.R. 676, 696 (1986). La retroactividad de la ley de 2003 significa que sus disposiciones, como el término prescriptivo del Art. 42(c), supra, aplican a los actos y acuerdos tomados antes de la vigencia de la ley, en los inmuebles sometidos al régimen de propiedad horizontal. No significa que el nuevo término de prescripción del Art. 42(c), id., comience a contar desde antes de la vigencia de la ley pues hasta ese momento no podía ejercerse la acción.

Ahora bien, diferimos de la conclusión a la que llega la opinión disidente en cuanto a que el plazo de dos años que tenía el señor Pereira Suárez para impugnar el contrato ante el DACo, contándolo a partir de la fecha de vigencia de la Ley Núm. 103, supra, quedó interrumpido por la querella que alegadamente se presentó en enero de 2003 y se reanudó en noviembre de 2004 cuando el DACo denegó la moción de reconsideración.

La opinión disidente fundamenta su teoría a base de una alegada querella de la cual no hay constancia en el expediente de este caso. Cabe recordar que "[e]s principio rector que meras alegaciones y teorías, como tampoco

argumentos forenses, constituyen prueba". <u>Alberty v. Bco.</u>
<u>Gub. de Fomento</u>, 149 D.P.R. 655, 671 (1999); <u>Pueblo v.</u>
<u>Amparo</u>, 146 D.P.R. 467, 478 esc. 1 (1998); <u>Pressure</u>
<u>Vessels P.R. v. Empire Gas P.R.</u>, 137 D.P.R. 497 (1994);
<u>Ramos, Escobales v. García, González</u>, 134 D.P.R. 969
(1993); <u>Defendini Collazo *et al* v. E.L.A., Cotto</u>, 134
D.P.R. 28 (1993). "Hemos sostenido que la obligación de
presentar evidencia **recae principalmente sobre la parte**
**que sostiene la afirmativa en la cuestión en controversia.**
Meras alegaciones o teorías no constituyen prueba".
(Énfasis nuestro; escolio omitido). <u>Reece Corp. v. Ariela,</u>
<u>Inc.</u>, 122 D.P.R. 270, 286 (1988), citando a <u>Asoc.</u>
<u>Auténtica Empl. v. Municipio de Bayamón</u>, 111 D.P.R. 527,
531 (1981). Véase también la Regla 110(B) de Evidencia de
2009, 32 L.P.R.A. Ap. VI y la Regla 10(B) de Evidencia de
1979, 32 L.P.R.A. Ap. IV. (La obligación de presentar
evidencia primeramente recae sobre la parte que sostiene
la afirmativa en la cuestión en controversia). "[Q]uien
sólo niega la existencia de algo no debe sufrir la carga
de presentar evidencia; considérese el caso de quien niega
la existencia de centauros, sirenas y cosas similares".
E.L. Chiesa, <u>Tratado de derecho probatorio: reglas de</u>
<u>evidencia de Puerto Rico y federales)</u>, 1ra ed. –
reimpresión, EE.UU.A., Pubs. J.T.S., 2005, T. II, Sec.
14.8(B), pág. 1110. No vemos razón alguna para que el
mismo principio no aplique en un procedimiento
administrativo. Véase, por ejemplo, la Sec. 556(d) de la

*Administrative Procedure Act* (A.P.A.), 5 U.S.C. sec. 556(d).

> Es propio concluir que existe la obligación de presentar toda la evidencia pertinente ante la agencia. De soslayarse la presentación de cuestiones y de evidencia pertinente disponible a la parte puede significar la renuncia a su presentación. Es un principio básico en este campo con mucha solera que toda la evidencia pertinente disponible tiene que ser presentada primeramente ante la agencia. Cualquier cuestión que no haya sido traída ante la consideración de la agencia no podrá ser objeto de revisión por el tribunal. La revisión de la actuación administrativa se contrae tanto al récord como a las cuestiones que se le plantearon al organismo. Permea este precepto las doctrinas de la jurisdicción primaria y del agotamiento de los remedios. Se le ha negado a la agencia la oportunidad de enfrentarse a esa cuestión, y de corregir cualquier apreciación de la prueba. El resultado neto de la actuación judicial, que considera evidencia nunca antes presentada ante el organismo administrativo, es la usurpación de la función adjudicativa de la agencia en primera instancia. (Escolios omitidos.)

> D. Fernández Quiñones, <u>Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme</u>, 2da ed., Colombia, Forum, 2001, Sec. 4.2, pág. 160.

En conclusión, ante la ausencia total de prueba de su existencia, no podemos atribuirle peso alguno a una supuesta querella cuyo alcance desconocemos y de la cual el señor Pereira Suárez no incluyó copia en el récord de este caso. Recordemos que Crown Castle adujo en su alegato ante este Tribunal que desconocía de la querella, pues nunca se hizo alusión a ella durante todo el procedimiento administrativo y judicial ni forma parte del récord del caso. Ante esta alegación, lo menos que debió hacer el señor Pereira Suárez, como querellante en el DACo, era presentar prueba de que ese hecho ocurrió. Ni siquiera le

pidió al DACo que tomara conocimiento de la alegada querella anterior.

No lo hizo por una sola razón: El recurrido Pereira Suárez nunca alegó que hubiera interrumpido el término prescriptivo del Art. 42(c), supra. Su defensa se basó exclusivamente en que el acto impugnado era nulo y por lo tanto, no le aplica el plazo de prescripción del Art. 42(c).

Es norma reiterada "que los dictámenes de los organismos administrativos merecen la mayor deferencia judicial". Calderón Otero v. C.F.S.E., Op. de 29 de marzo de 2011, 2011 T.S.P.R. 48, 2011 J.T.S. 52, 181 D.P.R. __ (2011). Véanse, además, Asoc. Fcias. v. Caribe Specialty et al. II, Op. de 23 de septiembre de 2010, 2010 T.S.P.R. 204, 2010 J.T.S. 213, 179 D.P.R. ___ (2010); Otero v. Toyota, 163 D.P.R. 716 (2005). Esto es así pues "son ellas las que cuentan con el conocimiento experto y con la experiencia especializada de los asuntos que les son encomendados". Íd., pág. 727. Véanse, además, Rebollo v. Yiyi Motors, 161 D.P.R. 69, 78 (2004); Pachecho v. Estancias, 160 D.P.R. 409, 431 (2003). Por ello, "[l]os tribunales no deben intervenir con las determinaciones de hecho de un organismo administrativo **si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad**". (Énfasis nuestro.) Domínguez v. Caguas Expressway Motors, 148 D.P.R. 387, 397 (1999). Véanse, además, Calderón Otero v. C.F.S.E., supra; Borschow Hosp. v. Jta. De

Planificación, 177 D.P.R. 545 (2009); JP, Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177 (2009); Metropolitana S.E. v. A.R.Pe., 138 D.P.R. 200 (1995) Véase también la Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2175.[5] La evidencia sustancial es "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". Íd., pág. 728, citando a Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 131 (1998). Véase, además, Hilton Hotels v. Junta Salario Mínimo, 74 D.P.R. 670, 687 (1953).

Ahora bien, la deferencia a las agencias administrativas en sus determinaciones de hechos **no es absoluta**. Por consiguiente, "[e]l tribunal podrá sustituir el criterio de la agencia por el propio sólo cuando no pueda hallar una base racional para explicar la decisión administrativa". Misión Ind. P.R. v. J.P., supra, págs. 134-135.

No obstante lo anterior, hemos dicho que quien quiera probar que las determinaciones de hecho de una agencia no

---

[5] "§ 2175. Revisión-Alcance

El tribunal podrá conceder el remedio apropiado si determina que el peticionario tiene derecho a un remedio.

Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo.

Las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal."

Sec. 4.5, 3 L.P.R.A. sec. 2175.

se sostienen en el expediente debe demostrar que "existe otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la prueba presentada y hasta el punto que se demuestre claramente que la decisión (del organismo administrativo) no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración". Domínguez v. Caguas Expressway Motors, supra, pág. 398, citando a Hilton Hotels v. Junta Salario Mínimo, supra, págs. 686. "Si en la solicitud de revisión la parte afectada no demuestra la existencia de esa otra prueba, las determinaciones de hecho de la agencia deben ser sostenidas por el tribunal revisor". Íd. Véase, además, Ramírez v. Depto. de Salud, 147 D.P.R. 901 (1999). Por último, cabe señalar que en cuanto a las "conclusiones de derecho de la agencia, distinto de las determinaciones de hecho, el tribunal las puede revisar en todos sus aspectos, sin sujeción a norma o criterio alguno." Rebollo v. Yiyi Motors, 161 D.P.R. 69, 77 (2004). Véase, además, la Sec. 4.5 de la L.P.A.U., 3 L.P.R.A. sec. 2175.

El expediente ante nuestra consideración se encuentra huérfano de prueba que sostenga que el señor Pereira Suárez manifestó, formal o informalmente, su malestar con el equipo, tan pronto se enteró de su instalación en la azotea. La supuesta manifestación de inconformidad con el equipo no se sostiene con cartas, ni mucho menos con algún

testimonio de los que asistieron a la vista administrativa.

Como expresáramos, los tribunales tenemos la potestad de intervenir con las decisiones de las agencias administrativas cuando sus conclusiones de hecho **no se sustentan con la prueba que obra en el expediente.** Precisamente eso es lo que pasa aquí. No se pasó prueba de una interrupción del plazo, así que no podemos concluir si las gestiones que realizó el señor Pereira Suárez en efecto interrumpieron la prescripción. Correspondía a este último probar la interrupción, pero no lo hizo. Ni siquiera la alegó como defensa, pues su teoría siempre fue que no había término que aplicara a la situación acaecida porque se trataba de un acto nulo.

Asimismo, a pesar de que la doctrina exige que la parte afectada demuestre que existe otra prueba en el record que razonablemente reduzca o menoscabe el peso de la determinación de hecho adoptada por la agencia, lo cierto es que, en este caso, el expediente carece de prueba documental o testimonial que demuestre que se llevó a cabo la interrupción extrajudicialmente.

La opinión disidente sustenta la interrupción del término prescriptivo en la alegación desprovista de prueba respecto a la presentación de la querella el 3 de enero de 2003. Esa alegación fue rechazada por la parte peticionaria en su alegato ante este Tribunal y la parte recurrida nunca la invocó como defensa. Solo lo mencionó en su alegato de réplica pero no nos colocó en posición de

concluir que, en efecto, esa querella sí se presentó. Por ello, ¿cómo le vamos a exigir a Crown Castle que pruebe que no ocurrió lo que ni siquiera el señor Pereira Suárez aduce? La opinión disidente sostiene también que "debemos considerar que los foros inferiores no discutieron la prueba sobre la interrupción del plazo porque pensaban que no había tal plazo". Op. disidente, pág. 21. Sin embargo, la opinión disidente omite que desde que Crown Castle intervino en este pleito adujo siempre la defensa de prescripción. Por ello, el señor Pereira Suárez tuvo la oportunidad de alegar, aunque fuera en la alternativa, si bajo los fundamentos de prescripción aducidos por Crown Castle hubo interrupción del término de prescripción. En cambio, prefirió alegar una sola defensa –nulidad– y descartó alegar interrupción del plazo dispuesto en el Art. 42(c), supra. Nuestra función es clara: interpretar la ley. No podemos suplir las defensas que las partes omiten o renuncian.[6]

Por eso concluimos que no se alegó ni mucho menos se estableció con evidencia sustancial que obre en el expediente que el señor Pereira Suárez interrumpiera el término. Los derechos deben procurarse con premura; de lo contrario se pierden. Más aún, al contar el término a

---

[6] Por ello tampoco procede devolver el caso para que el Tribunal de Apelaciones evalúe los méritos del caso; ya lo hizo, a diferencia de lo que ocurrió en Crespo Quiñones v. Santiago Velázquez, 176 D.P.R. 408 (2009), que cita la disidencia. Allí el Tribunal de Apelaciones se declaró sin jurisdicción y no atendió los méritos del recurso. Por eso lo devolvimos al revocar.

partir del 4 de julio de 2003, fecha de vigencia de la Ley Núm. 103, tenemos que concluir forzosamente que el recurrido Pereira Suárez presentó su querella en DACo fuera del término que dispone el Art. 42 (c), supra. Esto es así pues la única querella que tenemos ante nos es del 2 de septiembre de 2005, dos años y casi dos meses después de la vigencia de la ley. Por eso, al esperar más de dos años para acudir al DACo a impugnar la decisión de la Junta de Directores, el recurrido perdió su causa de acción.

A la luz de todo lo anterior, concluimos que la acción de impugnación que presentó el recurrido estaba prescrita. En vista del resultado al que llegamos, se hace innecesario discutir los demás errores planteados.

V

Por los fundamentos expuestos se revoca la sentencia emitida por el Tribunal de Apelaciones. En su lugar, se deja sin efecto la orden del DACo y se ordena el archivo, por prescripción, de la acción de impugnación del acuerdo de la Junta de Directores del Condominio Ponciana.

Se dictará sentencia de conformidad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Miguel A. Pereira Suárez

     Recurrido

       v.

Junta de Directores del      CC-2008-1014
Condominio Ponciana

     Peticionario

Crown Castle International
Corporation de Puerto Rico

  Interventora-Peticionaria

SENTENCIA

En San Juan, Puerto Rico, a 30 de junio de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se revoca la sentencia emitida por el Tribunal de Apelaciones. En su lugar, se deja sin efecto la orden del DACo y se ordena el archivo, por prescripción, de la acción de impugnación del acuerdo de la Junta de Directores del Condominio Ponciana.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta emitió opinión concurrente y disidente, a la cual se unieron el Juez Presidente señor Hernández Denton y la Juez Asociada señora Rodríguez Rodríguez.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Miguel A. Pereira Suárez
      Recurrido


            v.
                                    CC-2008-1014

    Junta de Directores del
  Condominio Ponciana, *et al.*
        Peticionarios


Opinión concurrente y disidente emitida por la Jueza Asociada señora FIOL MATTA a la cual se unen el Juez Presidente señor HERNÁNDEZ DENTON y la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ


En San Juan, Puerto Rico, a 30 de junio de 2011.

La Opinión mayoritaria resuelve correctamente la cuestión general de Derecho ante nuestra consideración: el término prescriptivo de dos años establecido en el artículo 42(c) de la Ley de Condominios de 2003 aplica a la impugnación de actos que requieren el consentimiento unánime de los condóminos para su aprobación pero se realizan sin obtener el mismo. También es correcta su conclusión de que dicho periodo prescriptivo aplica a partir de la fecha de vigencia de esa Ley, el 4 de julio de 2003. Sin embargo, la Opinión falla al no

considerar la probable interrupción de ese término prescriptivo en este caso y al colocar en el recurrido el peso de probar que su acción no prescribió, obviando que la prescripción es una defensa presentada por el peticionario y que es éste quien está llamado a asumir el peso de probarla.

La controversia del recurso se resume en si estaba prescrita una acción para impugnar un contrato de arrendamiento exclusivo e ilimitado para instalar y operar equipos de telecomunicaciones en la azotea de un condominio. Este contrato con la compañía Crown Castle International lo firmó el presidente de la Junta de Directores sin el consentimiento ni el conocimiento de los titulares de los apartamentos. La impugnación ante el Departamento de Asuntos del Consumidor (DACO) la presentó uno de los condóminos, casi seis años y medio después del acuerdo.

I

El señor Miguel Pereira Suárez vivía en el *penthouse* del Condominio Ponciana, en Ponce, cuando, cerca de finales de marzo de 1999, vio que estaban colocando unas antenas en la azotea de su edificio, sometido al régimen de propiedad horizontal desde 1971. Según las determinaciones de hechos del DACO, agencia ante la cual se querelló Pereira Suárez, tan pronto él se percató de la instalación de las antenas, manifestó verbalmente su objeción al entonces administrador del Condominio, quien le indicó que se celebraría una reunión del Consejo de Titulares para discutir el asunto.[7] No

---

[7] Determinación de Hecho 10 del DACO, Apéndice del Certiorari, pág. 43. La Opinión mayoritaria menciona esta

obstante, no se celebraron asambleas del Consejo para discutir las preocupaciones de los condóminos respecto al contrato sino hasta el 24 de abril de 2001.[8] Las objeciones de los titulares se volvieron a discutir en otra asamblea del Consejo, el 27 de noviembre de 2001.[9] Finalmente, el 2 de abril de 2002, se llevó a cabo una tercera reunión del Consejo, en la que la presidenta Laboy advirtió que Crown Castle no había accedido a remover las antenas y el Condominio no tenía dinero para obligarla a hacerlo legalmente, por lo que recomendaba a los titulares interesados que se querellaran personalmente.[10] Así lo hizo Pereira Suárez el 3 de enero de 2003, al presentar una querella en el DACO en la cual impugnó los actos de la Junta.[11] El 30 de junio de 2004, la agencia archivó sin

---

determinación de hecho como una mera alegación. La transcripción de la vista en el DACO no se incluyó en el Apéndice del Certiorari. Los detalles de los testimonios ante la agencia surgen de la Resolución del DACO y de los alegatos de las partes.

[8] Determinación de Hecho 11 del DACO, Apéndice del Certiorari, pág. 43. La Resolución del DACO identifica como exhibit el Libro de Actas del Condominio, pero no se incluyó copia de éste en el Apéndice del Certiorari. Asimismo, el peticionario informa que el Condominio no tiene actas de reuniones anteriores al 2001. Certiorari, pág. 6.

[9] Determinaciones de Hechos 12 y 13 del DACO, Apéndice del Certiorari, págs. 43-44; Conclusiones del DACO, Apéndice del Certiorari, págs. 50-51.

[10] Determinación de Hecho 14 del DACO, Apéndice del Certiorari, pág. 44. Nótese que Crown Castle, al menos desde el 2002, estaba al tanto de las objeciones de los condóminos. No las conoció por primera vez al recibir la notificación de la segunda querella de Pereira Suárez.

[11] No hay copia de esta querella ni de la Resolución del DACO sobre ésta en el expediente, pero se menciona en el Alegato de Réplica del recurrido ante el Tribunal Supremo, pág. 9, y

perjuicio la querella por falta de trámite, y denegó una moción de reconsideración de Pereira Suárez el 8 de noviembre de 2004.

Pereira Suárez presentó nuevamente su querella contra la Junta el 2 de septiembre de 2005. Solicitó que se declarara nulo el contrato de arrendamiento de la azotea y se removieran los equipos. Enmendó la querella el 3 de marzo de 2006 para incluir a Crown Castle como querellado.[12] El 4 de abril de 2007, Crown Castle solicitó que se le considerara parte interventora en el procedimiento administrativo y pidió su desestimación por prescripción.[13] El DACO declaró nulo el contrato, basado en el requisito de consentimiento unánime de los titulares para conferir derechos sobre elementos comunes generales, establecido en la Ley de Condominios de 2003.[14]

---

en la Moción en Cumplimiento de Orden de la Junta de Directores del Condominio Ponciana ante el Tribunal de Apelaciones, págs. 1 y 2, en el expediente del caso en el foro apelativo sin numerar. Está identificada como Querella Núm. 600004623.

[12] Querella Núm. 100029153, Apéndice del Certiorari, págs. 1-4.

[13] Apéndice del Certiorari, págs. 8-16. Crown Castle alegó que la querella estaba prescrita según el artículo 42(c) de la Ley de Condominios de 2003, si no aplicaba el término de 30 días que proveía la Ley de Propiedad Horizontal anterior para impugnar acuerdos del Consejo de Titulares o de la Junta de Directores. Debemos aclarar que ese término prescriptivo de la antigua Ley no le aplicaba a casos como el presente, en que se altera el uso de un elemento común del condominio. *Véase* Brown v. Junta Directores Cond. Playa Grande, 154 D.P.R. 225 (2001).

[14] Resolución del DACO, Apéndice del Certiorari, págs. 41-55. Sobre el requisito de unanimidad, *véanse* Art. 11 de la Ley de Condominios de 2003, 31 L.P.R.A. sec. 1291; Rivera Rodríguez v. Junta Directores Cond. Torre Caparra, 173

El mismo análisis utilizó el Tribunal de Apelaciones para confirmar el dictamen de la agencia administrativa, afirmando que el contrato de arrendamiento sin el consentimiento unánime de los titulares fue un acto *ultra vires* y nulo en Derecho, por lo cual no se activó término prescriptivo alguno para reclamar su corrección.[15]

---

D.P.R. 475 (2008). El DACO ordenó a la Junta celebrar una asamblea del Consejo de Titulares en la que decidieran por unanimidad si ratificarían el contrato o exigirían la remoción de las antenas. Sobre los contratos inexistentes que pueden comenzar a surtir efectos una vez ratificados por quien debía consentir al negocio, *véanse* Art. 1211 del Código Civil, 31 L.P.R.A. sec. 3376; Soto v. Rivera, 144 D.P.R. 500, 514-516 (1997).

[15] Pereira Suárez v. Junta Directores Condominio Ponciana v. Banco Santander, Crown Castle International Corp., Sentencia del Tribunal de Apelaciones KLRA200800029, 27 de agosto de 2008, Apéndice del Certiorari, págs. 122-134. El foro apelativo también usó como fundamento nuestra decisión en *Rivera Rodríguez v. Junta Directores Cond. Torre Caparra*, 173 D.P.R. 475 (2008). Ahí establecimos que un contrato en el cual se arrienda parte de la azotea del condominio a una compañía comercial de telecomunicaciones para colocar antenas y otros equipos, aprobado sin el consentimiento unánime de los residentes, es nulo porque está prohibido ceder derechos sobre el uso de los elementos comunes del inmueble sin la aprobación de todos los titulares. Para resolver el presente caso hace falta determinar si fue presentado dentro del término prescriptivo. Entonces, se analizaría si procede anular el contrato en virtud del precedente de *Rivera Rodríguez*, que tiene hechos muy similares. Podemos resaltar cuatro diferencias entre ambos casos: (1) en *Rivera Rodríguez*, el edificio era residencial, mientras que el Condominio Ponciana es residencial y comercial; (2) en *Rivera Rodríguez*, el contrato tenía un término menor de seis años, y aquí el arrendamiento es por más de seis años, lo que se considera un acto de enajenación de la azotea en la que los residentes mantienen sus propias antenas y los compresores de sus acondicionadores de aire; (3) en *Rivera Rodríguez*, el contrato impugnado había sido aprobado por una mayoría de los titulares antes de su firma, mientras que los residentes del Condominio Ponciana no fueron informados sobre el arrendamiento, y (4) el peticionario Rivera Rodríguez presentó su querella en el DACO poco más de un mes después del acuerdo; el recurrido Pereira Suárez tardó varios años. *Véanse* el artículo 11 de Ley de Condominios de 2003, sobre la imposibilidad de

El interventor Crown Castle recurrió a este Tribunal para que se revocaran esas decisiones y se declarara prescrita la acción del señor Pereira Suárez, en virtud del artículo 42(c) de la Ley de Condominios de 2003.[16] Así lo resuelve la Opinión mayoritaria y, por los fundamentos que paso a exponer, disiento.

## II

Bajo la Ley de la Propiedad Horizontal de 1976, vigente cuando se realizó el contrato y cuando se celebraron las reuniones del Consejo de Titulares, no había límite de tiempo para impugnar actos que requerían la aprobación unánime de los titulares y se llevaron a cabo sin ella. Para evitar que la falta de plazo permitiera que las actividades que los condóminos habían aceptado por muchos años se cuestionaran después, la Ley de Condominios de 2003 exigió a los titulares ser diligentes en sus reclamos a través del establecimiento de un término prescriptivo de dos años. Con ello se buscó brindar estabilidad al régimen y prevenir querellas frívolas de quienes habían dado su consentimiento

---

enajenar elementos comunes generales como áreas privadas, 31 L.P.R.A. sec. 1291i(b), y la Opinión disidente del juez Hernández Denton en Rivera Rodríguez, *supra*, a las págs. 495-498.

[16] El peticionario también planteó como error que se utilizara la decisión de *Rivera Rodríguez* para resolver este caso, pues alega que aquél sólo aplica a condominios exclusivamente residenciales y el Condominio Ponciana es mixto, con los primeros cinco de sus doce pisos dedicados a usos comerciales. Debido a que la Opinión mayoritaria no atiende dicho planteamiento y su relevancia va a depender de la determinación sobre prescripción, no discutiremos ese señalamiento de error.

tácito a cambios que, siendo evidentes por largo tiempo, objetaron tardíamente.[17]

Amparados en ese propósito de la Ley de 2003 y en que ésta aplicaría a todos los inmuebles sometidos al régimen de propiedad horizontal sin importar la fecha de su constitución, establecimos la aplicación retroactiva de sus disposiciones en *Consejo de Titulares v. Williams Hospitality*, 168 D.P.R. 101 (2006). Sin embargo, aclaramos en ese caso que la retroactividad de la Ley de 2003 dependería de la situación y no se extendería a relaciones jurídicas surgidas antes de la vigencia de la nueva ley si con ello se afectaban derechos adquiridos por los titulares.[18]

En el caso que ahora nos ocupa, resolvemos que los términos prescriptivos dispuestos en la Ley de 2003 se cuentan a partir de la fecha de vigencia de ésta, el 4 de julio de 2003, que es 90 días después de su aprobación.[19] De ese modo, se evitan situaciones absurdas en las que el término prescriptivo de la acción empiece y termine de transcurrir antes de que ese término prescriptivo exista, como sucedería en este caso si el plazo de dos años se contara a partir del contrato de 1999.

---

[17] M.J. Godreau, La nueva Ley de Condominios, 2da ed., San Juan, Ed. Dictum, 2003, págs. 28-30.

[18] Consejo de Titulares v. Williams Hospitality, 168 D.P.R. 101, 110 (2006). *Véase también* Serrano Muñoz v. Auxilio Mutuo, 171 D.P.R. 717, 728 escolio 15 (2007).

[19] Art. 44, Ley de Condominios, Ley Núm. 103 de 5 de abril de 2003.

Una norma básica de nuestro ordenamiento es la que dicta que las leyes, de ordinario, no tienen efecto retroactivo. Cuando un estatuto dispone lo contrario, ese efecto retroactivo no puede perjudicar los derechos adquiridos al amparo de una ley anterior.[20] Ese precepto se basa en que la ciudadanía necesita tener seguridad sobre las consecuencias de su comportamiento y sólo las relaciones jurídicas que caen bajo la vigencia de una regla deben estar gobernadas por ella.[21] Es por ello que, en palabras del juez asociado Negrón García, "en nuestra democracia rige el principio de la irretroactividad, las leyes miran hacia el porvenir, no hacia el pasado".[22]

En *Alicea v. Córdova*, 117 D.P.R. 676, 696 (1986), citando jurisprudencia estadounidense, establecimos que "[s]i el estatuto opera inmediatamente para eliminar el remedio existente, o dentro de un periodo de tiempo tan corto que no le da a la parte perjudicada una oportunidad razonable para ejercitar la acción, el estatuto es inconstitucional". Igualmente, el tratadista español Luis Diéz-Picazo explica que, cuando una ley nueva establece un período prescriptivo más breve para una acción que tenía un

---

[20] Art. 3, Código Civil, 31 L.P.R.A. sec. 3.

[21] Vázquez v. Morales, 114 D.P.R. 822, 826 (1983) (Citas omitidas.).

[22] A.S. Negrón García, "El Caño: ley inconstitucional no es Derecho", en: Opinión, El Nuevo Día, 24 de junio de 2009. *Véanse también*: Juramentación del Hon. Luis F. Estrella Martínez, 181 D.P.R. ___ (2011); Domínguez Castro v. ELA, Opinión disidente de la jueza Fiol Matta, 178 D.P.R. 1, 130 (2010).

término más largo bajo la ley vigente cuando surgió la acción, opera una "retroactividad mínima".[23] Según esa teoría, está permitido que los derechos nacidos según la ley anterior se rijan por la prescripción de la ley nueva, pero sólo desde que el nuevo término prescriptivo esté en vigor. Esto es, que el transcurso del período más reciente y más corto se cuenta desde la vigencia de la ley que lo establece y no desde que existe la causa de acción. Asimismo, no se puede sumar el tiempo que transcurrió bajo la ley anterior al que haya pasado bajo la ley nueva para completar el plazo más breve.[24]

El artículo 42(c) de la Ley de Condominios de 2003 dispone que: "La acción de impugnación de acuerdos, acciones u omisiones de la Junta de Directores, del Consejo de Titulares, con excepción de los realizados por el titular que somete el inmueble al régimen, que violen las disposiciones de esta Ley, de la escritura matriz o del Reglamento del condominio, prescribirá a los dos (2) años de haberse notificado el acuerdo, tomado la acción o de conocerse la omisión".[25]

Cabe señalar que dudamos, incluso, que este artículo aplique a los hechos de este caso, pues se refiere a acuerdos tomados por el Consejo de Titulares o la Junta de

---

[23] L. Díez-Picazo, La prescripción extintiva en el Código Civil y en la jurisprudencia del Tribunal Supremo, 2da ed., Navarra, Thomson Civitas, 2007, pág. 49.

[24] Íd. págs. 49-51.

[25] Art. 42, Ley de Condominios, Ley Núm. 103 de 5 de abril de 2003, 31 L.P.R.A. sec. 1293f.

Directores y el contrato en cuestión aparenta haber sido otorgado unilateralmente por el presidente, sin la intervención de la Junta y sin notificación a los titulares, ni siquiera posteriormente.[26] Recordemos que el entonces presidente de la Junta de Directores del Condominio, Ángel Llavona Folguera, firmó el contrato con Crown Castle para que ésta mantuviera y operara las antenas por un plazo de 25 años, prorrogable por 25 años más, a cambio de un canon mensual de $700.[27] Según las determinaciones de hechos del DACO, aunque Llavona Folguera aparece como representante de la Asociación de Propietarios de Ponciana en el documento del acuerdo, el Consejo de Titulares no le había autorizado realizar el pacto.[28] No surge del expediente que el resto de la Junta de Directores hubiese aprobado tal acuerdo ni que se hubiese informado de éste posteriormente a los titulares de los apartamentos. Además, en la misma fecha, Llavona Folguera, en su carácter individual, otorgó otro contrato con Crown Castle, en el que le arrendó, por $1,300 mensuales, un apartamento comercial suyo en el quinto piso del Condominio para que colocara unos equipos que se conectan a las antenas mediante unos cables que corren por

---

[26] *Véanse* Arts. 38-38e de la Ley de Condominios de 2003, 31 L.P.R.A. secs. 1293b-1293b-4A.

[27] El contrato no se incluyó en el Apéndice del Certiorari. Los detalles del acuerdo surgen de las Determinaciones de Hechos 6 y 8 de la Resolución del DACO de 1 de noviembre de 2007, Apéndice del Certiorari, pág. 42, y de los alegatos de las partes.

[28] Determinaciones de Hechos 6 y 7 del DACO, Apéndice del Certiorari, pág. 42.

la pared exterior del edificio.[29] Por ello, en la segunda asamblea del Consejo de Titulares, en noviembre de 2001, la nueva presidenta de la Junta, Olga Laboy, informó que Llavona Folguera firmó el contrato sobre las antenas sin endosos y con un claro conflicto de intereses.[30] Ante estos hechos, se debería evaluar prueba para determinar si el contrato es realmente anulable o es definitivamente nulo, en cuyo caso no aplicaría el término prescriptivo que estamos analizando.

Poniendo a un lado esa preocupación, no hay duda que el término prescriptivo mencionado debe emplearse cuando se impugnen acciones permitidas que, aunque requieren el consentimiento unánime de los titulares, se llevan a cabo sin esa aprobación, *sin que los condóminos las objeten al enterarse*. Ello responde al propósito de la Ley, que, como hemos indicado y expone correctamente la Opinión mayoritaria, establece ese plazo para evitar que se afecte el ambiente de sana convivencia en el condominio y que se desaprueben decisiones que se presumían aceptadas por no haber encontrado oposición en años.[31] Así, desde el 2003, los actos que se pueden llevar a cabo con el aval de la totalidad de los titulares y se ejecutan sin la aprobación

---

[29] Determinación de Hecho 9 del DACO, Apéndice del Certiorari, pág. 43.

[30] Determinaciones de Hechos 11 y 12 del DACO, Apéndice del Certiorari, pág. 43.

[31] *Véase* <u>Pereira Suárez v. Junta Directores Condominio Ponciana</u>, Opinión mayoritaria del Tribunal Supremo, págs. 13-18.

de todos ellos, no son nulos sino anulables. El titular que desee que se anule el acuerdo tiene que reclamarlo dentro del período de dos años a partir de que se tomó la decisión, se le notificó o tuvo conocimiento de ésta.

La Opinión mayoritaria concluye correctamente que las disposiciones de la Ley de 2003 sobre nuevos términos prescriptivos para presentar reclamaciones aplican a todos los inmuebles sometidos al régimen de propiedad horizontal, sin importar la fecha en que se sometieron al régimen, a partir de la fecha de vigencia de la Ley de Condominios. Siendo ello así, y asumiendo que también sea correcta su conclusión en cuanto a la naturaleza anulable del contrato entre el presidente de la Junta de Directores del Condominio y Crown Castle, el plazo de dos años que tenía Pereira Suárez para impugnar el contrato ante el DACO empezó a transcurrir el 4 de julio de 2003. Ahora bien, la mayoría se equivoca al resolver que ese plazo no se interrumpió. Por el contrario, al no haberse resuelto la querella que Pereira Suárez presentó en enero de 2003, cuando no existía término para ejercer la acción, el periodo prescriptivo quedó en suspenso y no volvió a correr hasta noviembre de 2004, cuando el DACO le denegó la reconsideración del archivo sin perjuicio de esa querella. Por eso, debemos reconocer que la segunda querella, en septiembre de 2005, se presentó dentro del nuevo término de dos años.

III

La Opinión mayoritaria dice que no hay prueba en el expediente que permita concluir que las gestiones que

realizó el recurrido Pereira Suárez interrumpieron la prescripción, por lo que procede el archivo por prescripción de la acción de impugnación en este caso. Entiendo que esa conclusión es equivocada.

Sabemos que el transcurso del tiempo por sí mismo no tiene relevancia jurídica; se requiere también que la persona esté al tanto de que tiene a su disposición una acción para hacer valer un derecho y no actúe respecto a ésta.[32] Según las alegaciones de Pereira Suárez, tomadas como ciertas por el DACO, él se quejó con miembros de la Junta de Directores desde que se comenzaron a colocar las antenas y éstos no tomaron acción al respecto. Aunque sus argumentos van dirigidos a que se declare nulo el contrato, no deja de ser cierto que, como testificó ante el DACO, "[u]na y otra vez, informalmente y formalmente, expresó su desacuerdo con la instalación de dichas antenas".[33] De acuerdo con las determinaciones de hechos del DACO, el señor Pereira Suárez no se cruzó de brazos. Si la presentación formal de su reclamación se retrasó fue debido a la inacción de la Junta. Cuando se quejó de la instalación, se le dijo que el asunto se discutiría en una asamblea de titulares y ésta no se celebró hasta abril de 2001. Igualmente, cuando los residentes votaron por cancelar el contrato con Crown

---

[32] G. Orozco Pardo, La interrupción de la prescripción extintiva en el Derecho Civil, Granada, Ed. Universidad de Granada, 1986, págs. 40-42; R. Hernández Colón, Práctica Jurídica de Puerto Rico – Derecho Procesal Civil, 4ta ed., San Juan, LexisNexis, 2007, págs. 80-87.

[33] Memorando de Derecho de Pereira Suárez ante el DACO, Apéndice del Certiorari, pág. 30.

Castle, la presidenta de la Junta le informó que no llevaría a cabo la encomienda porque no tenía presupuesto para ello. Cabe mencionar que, hasta la tercera reunión, el recurrido estuvo participando de un proceso interno para tratar de solucionar la controversia, que es uno de los objetivos de la Ley de Condominios de 2003.[34] Mas, no encontró respuesta dentro del Condominio y, a partir de que la presidenta de la Junta le informó que no podría ayudarlo, salió a buscar auxilio en el DACO. De hecho, la Resolución del DACO establece que la Junta no atendió de forma alguna los reclamos de Pereira Suárez "para resolver una situación que a todas luces era ilegal".[35]

De parte del recurrido no hubo la inactividad que requiere la prescripción. Hemos asentado que "[n]o podemos castigar con el látigo de la prescripción a quien no incurrió en desidia ni en dejadez", pues la prescripción está diseñada para castigar la inercia.[36] Vale recalcar que el término prescriptivo de dos años de la Ley de Condominios se estableció para evitar querellas referentes a acciones que, a pesar de haber ocurrido muchos años atrás, nunca se habían objetado. En este caso sucedió todo lo contrario; *tan pronto Pereira Suárez vio que estaban colocando las antenas, se quejó y continuó quejándose.*

---

[34] Godreau, *op cit.*, págs. 39-40.

[35] Resolución del DACO, Apéndice del Certiorari, pág. 52.

[36] De León v. Caparra Center, 147 D.P.R. 797, 810 (1999).

La prescripción es una institución que busca atender el interés general de darle certeza a las relaciones jurídicas, pero que, a la vez, tiene que ser conciliada con el interés individual de los titulares de derechos que los quieren ejercer. Para ellos se provee el mecanismo de la interrupción de la prescripción.[37] La voluntad manifestada, como actividad que rompe con la inercia en cierto período, tiene el efecto de impedir que opere la prescripción, pues la inactividad de la parte que puede reclamar es un requisito esencial para que aplique. Cualquier manifestación que demuestre inequívocamente la voluntad de ejercer un derecho debe considerarse eficaz para interrumpir el plazo prescriptivo.[38] Esa exteriorización puede darse de modo judicial o extrajudicial. Para esa segunda vía, la ley no presenta requisitos; lo importante, sea cual sea el medio utilizado, es que la manifestación recoja la voluntad de exigir algo a lo que se tiene derecho y que sea susceptible de ser probada como "cuestión de hecho de apreciación exclusiva del tribunal de instancia".[39] También se permite

---

[37] Orozco Pardo, *op cit.*, págs. 57-58. Sin este mecanismo, todos los plazos serían de caducidad, es decir, fatales o inevitables.

[38] Sánchez v. Aut. de los Puertos, 153 D.P.R. 559, 567-569 (2001); Orozco Pardo, *op cit.*, págs. 31-35 y 56-57; M.R. Bachiller, La prescripción liberatoria en el Derecho Civil y Comercial, Buenos Aires, Ed. Ad-Hoc, 1985, pág. 117-118.

[39] Orozco Pardo, *op cit.*, pág. 195. *Véanse* Galib Frangie v. El Vocero, 138 D.P.R. 560, 567-568 (1995); Acosta Quiñones v. Matos Rodríguez, 135 D.P.R. 668, 675-676 (1994); Zambrana Maldonado v. ELA, 129 D.P.R. 740, 750-753 (1992); Díez-Picazo, *op cit.*, pág. 184-185; Orozco Pardo, *op cit.*, págs. 196-197.

que sea la parte contra quien se reclama la que interrumpa el término, mediante el reconocimiento de la deuda o el derecho del otro.[40]

El plazo prescriptivo corre a partir de que la persona se entera efectivamente del acto y puede ejercer su causa de acción.[41] Una vez interrumpido el término, las reclamaciones sucesivas pueden prolongarlo indefinidamente.[42] Cada interrupción tiene el efecto de que el plazo prescriptivo vuelva a contar entero.[43]

Cuando Pereira Suárez presentó su primera querella en la agencia, el 3 de enero de 2003, lo hizo dentro del término que se estableció en la Ley de Condominios y comenzó a regir el 4 de julio de 2003. Los procedimientos en torno a esa querella terminaron con su archivo *sin perjuicio* definitivo, el 8 de noviembre de 2004, lo que le brindaba la posibilidad de volver a presentar la querella ante el DACO en un periodo de dos años, que terminaba en noviembre de 2006. Por lo tanto, cuando Pereira Suárez se querelló por segunda vez, el 2 de septiembre de 2005, su acción no había prescrito.

Según Bachiller, la prescripción es una defensa afirmativa que los tribunales no aplican de oficio si la

---

[40] Art. 1873, Código Civil, 31 L.P.R.A. sec. 5303.

[41] Vera Morales v. Dr. Bravo, 161 D.P.R. 308, 321-331 (2004); Bachiller, *op cit.*, págs. 81-84.

[42] De León, *supra*, a las págs. 811-812.

[43] Díaz de Diana v. A.J.A.S. Ins. Co., 110 D.P.R. 471, 474-475 (1980).

parte a la que favorece no lo solicita, pero los jueces y las juezas sí pueden determinar que hubo interrupción si surge del expediente, aunque no se haya alegado.[44] En este caso, existen suficientes indicios de que el término para impugnar quedó interrumpido. La falta de detalles en cuanto a la prescripción en el expediente no se le debe adjudicar a la persona contra quien operaría la misma, sino al propio peticionario, así como al hecho de que este asunto no fue atendido por los foros inferiores.

Como afirma Orozco: "En definitiva, la prescripción del derecho es lo excepcional; su ejercicio o conservación, lo normal, por lo que nuestro ordenamiento debe potenciar el ejercicio y conservación de los derechos".[45] De hecho, la legislación moderna en los países civilistas admite expresamente la interrupción extrajudicial y su inclusión en los códigos respondió a la necesidad de reconocer la voluntad de conservación del derecho expresada por diversas vías, que era ignorada debido a la formalización excesiva del ordenamiento, que llevaba a considerar abandonada una acción aunque constara la existencia de una intención contraria.[46] Por eso, este Tribunal ha analizado de manera

---

[44] Bachiller, *op cit.*, pág. 295. *Véanse también* Díez-Picazo, *op cit.*, págs. 95-96 y 139; Orozco Pardo, *op cit.*, págs. 48-51.

[45] Orozco Pardo, *op cit.*, pág. 59. *Véase también* Díez-Picazo, *op cit.*, págs. 107-109.

[46] Díez-Picazo, *op cit.*, págs. 33-36.

liberal la prueba sobre reclamaciones interruptivas.[47] Ante la falta de información o de claridad en las alegaciones sobre la consumación o interrupción del término prescriptivo, no procede la medida drástica de archivar el caso por *suponer* que prescribió. Ello milita en contra de la política de la Rama Judicial de Puerto Rico de que los ciudadanos y las ciudadanas vean las controversias que presentan resueltas en sus méritos.[48]

IV

No cabe duda que los actos de interrupción tienen que ser probados cuando se alega que no opera la prescripción.[49] Pero ello supone que se haya reclamado *y probado* la prescripción. Por eso, es el peticionario quien tiene el peso de probar que la causa de Pereira Suárez está prescrita, demostrando que hay prueba en el récord de la agencia administrativa que permita concluir que la decisión del DACO no está justificada.

En este punto, conviene repasar algunos conceptos básicos sobre Derecho Probatorio y Derecho Administrativo. Entre los principios sobre la evaluación y suficiencia de la prueba recopilados en las Reglas de Evidencia, se encuentran unos que son fundamentales para resolver este caso, a saber: que el peso de la prueba recae sobre la parte que resultaría

---

[47] *Véase, por ejemplo*, Zambrana Maldonado, *supra*, a la pág. 761 (1992).

[48] *Véanse* Ghigliotti Arzola v. Admin. Servicios Agrícolas, 149 D.P.R. 902, 915 (1999); López v. Porrata-Doria, 140 D.P.R. 96 (1996).

[49] Orozco Pardo, *op cit.*, pág. 79.

vencida si no se presentara prueba, que la obligación de presentar evidencia la tiene principalmente quien sostiene la afirmativa y que, en casos civiles, no se exige que la prueba produzca certeza absoluta sobre los hechos, sino que la totalidad de la prueba haga más probable cierta conclusión.[50] En este caso, Crown Castle es quien pide que revoquemos la Sentencia del Tribunal de Apelaciones que confirmó al DACO y declaremos prescrita la acción. Por lo tanto, le corresponde asumir el peso de la prueba. Además, vista la poca prueba que obra en el expediente, parece más probable que se haya interrumpido el término prescriptivo.

Asimismo, debemos sostener las determinaciones de hechos de las agencias si están respaldadas por evidencia que razonablemente se podría considerar adecuada para sustentar la conclusión a la que se llega.[51] Esto más aun cuando el peticionario no aporta evidencia que derrote la presunción de corrección que tiene la decisión administrativa.[52] Hemos establecido que la parte que impugne las determinaciones de la agencia administrativa tiene que

---

[50] Regla 110 (A), (B), (C) y (F) de Evidencia de 2009, 32 L.P.R.A. Ap. VI R. 110. Aunque las Reglas de Evidencia no aplican en las vistas administrativas, sus principios fundamentales se utilizan como guías. Sec. 3.13(e), Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2163.

[51] Sec. 4.5, Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2175; Pacheco v. Estancias, 160 D.P.R. 409, 431-433 (2003). Véanse también S.L.G. Rivera Carrasquillo v. A.A.A., 177 D.P.R. 345, 356 (2009); Ramírez Ferrer v. Conagra Foods PR, 175 D.P.R. 799, 810-811 (2009); García Reyes v. Cruz Auto Corp., 173 D.P.R. 870, 898-899 (2008).

[52] Calderón Otero v. Corp. Fondo Seguro del Estado, 2011 T.S.P.R. 48, a la pág. 10; O.E.G. v. Rodríguez, 159 D.P.R. 98, 118-119 (2003).

convencer al Tribunal de que la conclusión de la agencia no fue razonable de acuerdo a la totalidad de la prueba en el expediente. Si quien solicita la revisión no demuestra que existe prueba en el expediente que indica que la actuación de la agencia no se basó en evidencia sustancial, debemos respetar las determinaciones de hechos del foro administrativo y no sustituir el criterio de la agencia.[53] Esto es así porque los tribunales apelativos "no tienen la facultad de realizar determinaciones sin base en el expediente de determinado caso ante su consideración".[54]

Si el expediente del caso presentado por Crown Castle está incompleto, no podemos castigar por ello a la parte recurrida. Es el peticionario quien tiene el deber de poner a este Tribunal en posición para determinar si, en efecto, operó la prescripción que presenta como defensa y como razón para revocar al foro que tuvo ante sí la prueba directa y al que lo confirmó. Sin embargo, el peticionario ni siquiera incluyó en su recurso toda la prueba que se presentó en el DACO.[55] Se limitó a solicitar que se aclarara una norma de Derecho, el término prescriptivo aplicable, pero no aportó los documentos necesarios para poder aplicar esa pauta a los

---

[53] <u>Otero Mercado v. Toyota</u>, 163 D.P.R. 716, 728 (2005).

[54] <u>Gutiérrez Vázquez v. Hernández y otros</u>, 172 D.P.R. 232, 244 (2007).

[55] Por ejemplo, en su Memorando de Derecho, menciona los documentos presentados en la vista administrativa, a la que asistió, pero no los incluye en el Apéndice. Apéndice del Certiorari, págs. 17-28.

hechos de su caso. Siendo así, no podemos concederle el remedio que solicita.

Más aun, los escritos de ambas partes se centran en la discusión de si el acto era nulo o era anulable y le aplicaba el término prescriptivo de la Ley de Condominios. De igual forma, los foros inferiores que decretaron la nulidad no discutieron la prueba sobre la interrupción del plazo porque pensaban que no había tal plazo. No lo consideraron necesario para resolver que la acción era nula, pues la acción de nulidad absoluta es imprescriptible.[56] Además, es pertinente resaltar que esta es la primera vez que este Tribunal se expresa acerca de la aplicación del término prescriptivo de dos años de la Ley de Condominios de 2003 para impugnar acciones que antes eran estrictamente nulas. Es costumbre de este Tribunal no aplicar una norma nueva a los hechos del caso en el que se está estableciendo la misma, excepto cuando razones de alto interés público lo exijan.[57]

---

[56] Como explica Salerno, "[s]i por motivos de orden público ciertos actos son fulminados de nulidad, no resulta congruente admitir la posibilidad de su eficacia por el transcurso de un tiempo más o menos prolongado, como un modo de dar estabilidad a una situación de hecho". M.U. Salerno, Nulidad absoluta y prescripción, Buenos Aires, Ed. Abeledo-Perrot, 1978, pág. 38. Por eso tampoco tuvo oportunidad el señor Pereira Suárez de presentar evidencia de la interrupción de la prescripción. El alegato del recurrido se centra en que "Crown Castle continúa exponiendo el punto de prescripción para tratar de salvar unos actos nulos". Alegato de Réplica, pág. 2. Véanse también las páginas 16-18 de ese alegato.

[57] Como ejemplo, véanse: Negrón Miró v. Vera Monroig, 2011 T.S.P.R. 90, a la pág. 24, 182 D.P.R. ___ (2011); ELA v. Crespo Torres, 2011 T.S.P.R. 15, a la pág. 29, 180 D.P.R. ___ (2011); Westernbank v. Registradora, 174 D.P.R. 779,

Lo único que este Tribunal tenía que determinar en esta etapa era si el plazo de prescripción de dos años aplica a la impugnación de actos que requerían el consentimiento unánime de los condóminos para su aprobación y se llevaron a cabo sin ésta.[58] Sin embargo, la Opinión mayoritaria, sin contar con los elementos necesarios para ello, declara prescrita la segunda querella, presentada dos años y dos meses después del establecimiento del término prescriptivo de dos años, porque decide ignorar la probabilidad de que cuando ese término empezó a transcurrir ya se había presentado una primera querella que interrumpió el término para la segunda. No pretendo que resolvamos el asunto de la prescripción a base de "meras alegaciones", porque reconozco que las alegaciones no constituyen prueba.[59] Mas tampoco

---

[58] 789-790 (2008); In re Silva Iglecia, 162 D.P.R. 105, 122 (2004); Rafael Rosario & Assoc. v. Depto. De Familia, 157 D.P.R. 306, 331 (2002); Banco de Desarrollo Económico v. AMC Surgery, 157 D.P.R. 150, 157 (2002); In re Marchand Quintero, 151 D.P.R. 973, 992 (2000); Pueblo v. Opio Opio, 104 D.P.R. 165, 170 (1975).

[58] Recientemente, resolvimos que no se debía adjudicar en los méritos un recurso en el que sólo contábamos con alegatos sobre un asunto de falta de jurisdicción y devolvimos el caso para que las partes pudieran elaborar sus argumentos. Crespo Quiñones v. Santiago Velázquez, 176 D.P.R. 408, 417-419 (2009). Aunque en el presente caso el Tribunal de Apelaciones y el DACO evaluaron en los méritos *una* controversia, lo concerniente a *la* controversia sobre la interrupción del término prescriptivo nunca se atendió en los foros inferiores, por lo que el resultado es el mismo que en *Crespo Quiñones* y procede que, al revocar la interpretación de Derecho que se hizo, devolvamos el recurso para que el foro primario evalúe la prueba pertinente.

[59] *Véase* Pereira Suárez v. Junta Directores Condominio Ponciana, Opinión mayoritaria del Tribunal Supremo, págs. 26-28.

puedo estar de acuerdo con que excluyamos sin más un hecho importante para adjudicar el caso.

Dado que en el expediente no consta la prueba necesaria para determinar si la acción está prescrita, lo que procede es devolver el caso a la agencia administrativa para que reciba y evalúe evidencia sobre el particular.[60] De esa forma, se podrían detallar las gestiones que realizó el señor Pereira Suárez y en qué fecha se hicieron, en lugar de descartar la presentación de la primera querella, hecho que mencionaron todas las partes pero sobre el cual no se presentó prueba probablemente porque se entendió que no era pertinente para la controversia que se estaba atendiendo. Así, evitaríamos ejercer una función que le corresponde al foro primario, en detrimento de los derechos de las partes, y permitiríamos que las partes argumenten de forma clara y específica el asunto sobre la prescripción o su interrupción.[61]

V

El disfrute del apartamento por su propietario y la institución del Consejo de Titulares como órgano de control

---

[60] Son abundantes los ejemplos de casos en que hemos devuelto el expediente al foro primario para que se pueda presentar prueba y resolver según lo dispuesto en este Tribunal. De hecho, así lo hicimos en *Consejo de Titulares v. Williams Hospitality*, *supra*, en el que decidimos que la Ley de Condominios de 2003 aplicaría retroactivamente en toda situación en la que no se afectara un derecho adquirido de los titulares de apartamentos, y devolvimos el caso al foro de instancia para que evaluara la prueba de acuerdo con lo resuelto.

[61] *Véase* Crespo Quiñones, *supra*, a las págs. 412-413 y 418-419.

último en la administración del condominio son características fundamentales del Régimen de Propiedad Horizontal en Puerto Rico, y sus principios rectores son la prohibición del abuso del derecho y la buena fe.[62] La decisión mayoritaria es contraria a estas políticas, ya que impide al dueño de un apartamento impugnar los actos sospechosos del presidente de la Junta de Directores de su condominio y la desidia de los administradores del inmueble, para su beneficio y el de los demás residentes. No puedo avalar que se utilice una disposición cuyo fin es penalizar la inercia para hacer todo lo contrario, penalizar la diligencia y persistencia del recurrido. Por todo ello, disiento.


                                        Liana Fiol Matta
                                        Jueza Asociada

---

[62] Exposición de Motivos y Art. 1A, Ley de Condominios, Ley Núm. 103 de 5 de abril de 2003.